United States Court of Appeals,

Eleventh Circuit.

No. 94-8398.

Tyrone BROOKS, Lanette Stanley, Billy McKinney, Joe Beasley, Venus E. Holmes, Michael Robinson, Edward Brown, John White, Mary Young-Cummings, Mary Black, Willie Mays, William Young, Deanie Frazier, G.L. Avery, Rev., Rev. Dr. William Howell, Plaintiffs-Counter-Defendants-Appellants,

Donale E. Cheeks, Emil Klingenfus, Inez Wylds, Richard Dyson, Vince Robertson, Intervenors-Plaintiffs, Cross-Claimants,

v.

GEORGIA STATE BOARD OF ELECTIONS, Max Cleland, Secretary of State and Chairman of the Georgia State Board of Elections, Defendants-Cross-Defendants, Appellees.

July 17, 1995.

Appeal from the United States District Court for the Southern District of Georgia. (No. CV288-146), B. Avant Edenfield, Chief Judge.

Before DUBINA, Circuit Judge, RONEY and ESCHBACH,[*] Senior Circuit Judges.

DUBINA, Circuit Judge:

Plaintiffs/Appellants, a group of black registered voters in the State of Georgia ("Plaintiffs"), appeal the district court's order denying their motion for approval of a proposed settlement agreement with Defendants/Appellees, the Georgia State Board of Elections *et al.* ("Defendants" or "the state"), in this action under Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c (1988). The settlement agreement is opposed by certain intervenors who argue that the terms of the agreement violate their state and federal constitutional rights. Because we conclude that we cannot

[*]Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

give any meaningful relief in this case, we dismiss this appeal as moot and remand the case to the district court for further proceedings.

## I.

Plaintiffs brought this action against the Defendant state agencies and officers in 1988, alleging that the method of electing judges of the state court, superior court, and court of appeals and justices of the supreme court in Georgia[1] violates Section 2 of the Voting Rights Act ("VRA") and the United States Constitution. Plaintiffs also claimed that superior court judgeships and circuit configurations that had been enacted by the Georgia legislature prior to November 1, 1964, required federal approval pursuant to

---

[1]The Constitution of the State of Georgia and various statutes promulgated thereunder provide for a system whereby judges of the state court, superior court, and court of appeals and justices of the supreme court are elected in nonpartisan judicial elections. Ga. Const. art. 6, § 7, ¶ 1 (1983); O.C.G.A. § 15-7-23 (1990). Georgia law, however, also empowers the Governor with the authority to appoint individuals to fill vacancies in the judiciary. Ga. Const. art. 6, § 7, ¶ 3 (1983); O.C.G.A. § 15-7-23 (1990). Thus, as the district court explained:

> The Georgia judicial electoral system involves aspects of both election and appointment. The vast majority of judges in this state have reached the bench via appointment. All judges and justices are subject to challenge in open elections at the expiration of their term of office. In reality, however, few incumbents are actually challenged in contested elections, and, of the few incumbents who are challenged, even fewer are defeated at the polls. Nevertheless, under the current system, qualified individuals can run against incumbent judges or justices in open elections and when that occurs, the voters choose who will serve them directly; the candidate having a majority of the votes in the election or the highest number of votes in a run-off wins.

*Brooks v. State Bd. of Elections,* 848 F.Supp. 1548, 1557 (S.D.Ga.1994) (citation omitted).

Section 5 of the VRA.

Pursuant to Section 5, a three-judge panel ("the Panel") was convened. In December 1989, the Panel held that Section 5 applied to judicial elections, that the Georgia electoral scheme has the potential for discriminating against minority voters, and that the State of Georgia failed to obtain the required preclearance for numerous changes to their electoral system. *Brooks v. State Bd. of Elections,* 775 F.Supp. 1470, 1484 (S.D.Ga.1989), *aff'd,* 498 U.S. 916, 111 S.Ct. 288, 112 L.Ed.2d 243 (1990). Consequently, the Panel enjoined further elections or appointments to judicial positions that had not been precleared, but allowed incumbents to serve out their terms. *Id.* at 1484.[2]

On June 17, 1992, Plaintiffs and Defendants reached a proposed settlement agreement. The agreement, presented to the district court in the form of a consent decree, provided, *inter alia,* that:

> (1) the Governor will hereafter appoint all judges in Georgia; (2) appointed judges will thereafter be subject only to retention elections; (3) by the end of 1994 there will be at least twenty-five black superior court judges and five additional blacks will be appointed to either the state court or the superior court; (4) in order to realize these numerical requirements, a new category of judgeships, "State Assignment Superior Court Judgeships" may be created and filled by black candidates to serve by assignment in any of the state's judicial circuits; and (5) any disputes that arise under this system in the future will be overseen by Senior District Judge Anthony A. Alaimo.

*Brooks v. State Bd. of Elections,* 848 F.Supp. 1548, 1551 (S.D.Ga.1994) (citing Consent Decree at 10-14).[3]

---

[2]By order dated February 28, 1994, this injunction was extended until March 1, 1995.

[3]We attach hereto as Exhibit A the proposed Consent Decree in its entirety.

On August 30, 1993, the Attorney General of the United States ("Attorney General") approved the proposed settlement, preclearing the changes to the Georgia system of judicial elections provided for in the settlement agreement. The Attorney General's approval was conditioned upon approval of the agreement by the district court and based on assurances by the Georgia Attorney General that the terms of the plan do not violate the Georgia Constitution. The Attorney General expressed concern, however, that certain provisions of the plan may be contrary to the United States Supreme Court's decision in *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).

In November of 1993, the Panel denied a motion to allow interim gubernatorial appointments to certain judicial posts pending a final decision by the district court on the proposed settlement agreement. Importantly, the Panel also severed the Section 5 and Section 2 portions of the case, retaining control over the Section 5 claims and directing that the Section 2 claims be addressed by the district court.[4]

On November 22, 1993, the district court certified a Plaintiff class consisting of all present and future black registered voters in Georgia, ordering that notice be given to absent class members

---

[4]The State of Georgia subsequently brought a declaratory judgment action under Section 5 of the VRA in the District Court for the District of Columbia. On February 3, 1995, that court entered judgment in favor of the state and declared that the statutes creating superior court judgeships after November 1, 1964, " "do[ ] not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color' " under section 5 of the Voting Rights Act of 1965. *Georgia v. Reno,* 881 F.Supp. 7, 14 (D.D.C.1995) (quoting 42 U.S.C. § 1973c).

pursuant to Fed.R.Civ.P. 23(e). On January 12, 1994, the court held a fairness hearing, at which the court heard evidence and argument from the Plaintiff class representatives, the Defendants, the intervenors, and several objectors.

Finally, on March 7, 1994, the district court entered an order denying the joint motion of Plaintiffs and Defendants seeking approval of the settlement agreement. The court first noted that there had been no determination to date, and no admission by Defendants, that the current Georgia judicial election system violates Section 2 or the federal Constitution. The court reasoned that absent such a finding, it would be inappropriate to force a change upon Georgia's citizens that would reduce their rights to elect public officials of their choice. *Brooks*, 848 F.Supp. at 1577. Furthermore, the court determined that certain provisions of the settlement would violate Georgia law. Most notably, the court found that a retention election system would not satisfy the Georgia constitutional requirement that judges be elected. *Id.* Moreover, the court held that some provisions of the settlement would violate the Equal Protection Clause of the Fourteenth Amendment, finding that the provisions requiring the appointment of thirty black judges by December 31, 1994, and establishing state assignment superior court judgeships were race-conscious measures that were not narrowly tailored to achieve a compelling state interest. *Id.* In sum, the court concluded that the settlement agreement was not "fair, adequate, reasonable and legal" under the "totality of [the] circumstances." *Id.* at 1578. Plaintiffs then

perfected this appeal pursuant to 28 U.S.C. § 1292(a)(1).[5]

## II.

We first must address the threshold jurisdictional question of whether this appeal is moot. Defendants suggest in their brief that the issues raised by Plaintiffs "may be moot." Appellee's Brief at 21. In response, Plaintiffs emphasize that "[t]he state has not argued that the case is in fact moot." Appellants' Reply Brief at 2. Regardless of whether the state has argued mootness, however, "[i]t is incumbent upon this court to consider issues of mootness *sua sponte* and, absent an applicable exception to the mootness doctrine, to dismiss any appeal that no longer presents a viable case or controversy." *Pacific Ins. Co. v. General Development Corp.,* 28 F.3d 1093, 1096 (11th Cir.1994).

Defendants point out that the proposed settlement agreement requires the state to add approximately twenty black superior court and/or state court judges to the bench by December 31, 1994, bringing the total number of black trial judges to thirty. Subsequent to January 1, 1995, the Governor of the State of Georgia is to make judicial appointments without regard to race, color, or ethnic origin. Obviously, because the deadline for the appointment of these black judges has passed, it is impossible for the state to comply with the "thirty-black-judge-minimum" requirement.

---

[5]Although Plaintiffs and Defendants made a joint motion to the district court for approval of the settlement, Defendants do not contest the district court's rejection of the settlement in this appeal. Instead, Defendants concede in their brief that they "were well aware that the proposed court order stretched to the limit the authority of both the state officials involved and of the district court...." Appellee's Brief at 20. Accordingly, Defendants assert that the district court did not abuse its discretion in rejecting the proposed settlement.

Moreover, any race-conscious appointments made at this late date would directly contravene the provision in the agreement requiring that appointments made subsequent to January 1, 1995, be "colorblind." Thus, even if we were to reverse the district court's order rejecting the settlement agreement, the agreement could not be implemented under its present terms.

Under Article III of the United States Constitution, federal courts may adjudicate only actual, ongoing cases or controversies. U.S. Const. art. III; *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477, 110 S.Ct. 1249, 1253, 108 L.Ed.2d 400 (1990). "It has long been settled that a federal court has no authority "to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.' " *Church of Scientology of California v. United States,* --- U.S. ----, ----, 113 S.Ct. 447, 449, 121 L.Ed.2d 313 (1992) (quoting *Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895)). "For that reason, if an event occurs while a case is pending on appeal that makes it impossible for the court to grant "any effectual relief whatever' to a prevailing party, the appeal must be dismissed." *Id.; see also Ethredge v. Hail,* 996 F.2d 1173, 1175 (11th Cir.1993). An appellate court simply does not have jurisdiction under Article III "to decide questions which have become moot by reason of intervening events." *C & C Products, Inc. v. Messick,* 700 F.2d 635, 636 (11th Cir.1983); *United States v. Florida Azalea Specialists,* 19 F.3d 620, 622 (11th Cir.1994).

Research reveals no case law on mootness presenting the exact

situation in the present appeal; that is, an appeal from a district court's rejection of a settlement agreement with specific deadlines that have expired. In an analogous situation, however, this court has consistently held that the appeal of a preliminary injunction is moot where the effective time period of the injunction has passed. For example, in *Tropicana Products Sales, Inc. v. Phillips Brokerage Co.,* 874 F.2d 1581 (11th Cir.1989), the plaintiff appealed from the district court's denial of a motion for a preliminary injunction that was to expire on February 13, 1989. The appeal was argued on March 21, 1989, several weeks after the end-date of the requested injunction. *Id.* at 1582. Because the effective dates of the preliminary injunction had expired, the court concluded that it could not grant effective relief and dismissed the appeal as moot. *Id.* at 1583. The court reasoned that "[t]he express limitation Tropicana's motion set for itself has divested this Court of jurisdiction over the appeal." *Id. See also Pacific Ins. Co.,* 28 F.3d at 1096 (holding that "no meaningful relief remains for us to provide" because "the injunction we are asked to review has expired by its own terms").

Similarly, because of intervening events, we could not grant effective or meaningful relief in the present case. The only issue before us on this appeal is the propriety of the district court's rejection of the proposed settlement agreement. As noted above, some of the deadlines in the agreement have already passed, making the settlement impossible to implement under its present terms. Consequently, it appears that a decision by this court reversing the district court's determination and ordering implementation of

the settlement agreement would not provide meaningful relief, since the state could not possibly comply with the key requirements of the settlement. Thus, any opinion we would render on the merits would be purely advisory.

At oral argument, Plaintiffs' counsel suggested that we could save this appeal from mootness by approving the settlement agreement "now for then," with either this court or the district court on remand modifying the dates in the agreement so that the state could comply with its terms. We disagree. First, we reiterate that the Article III "case or controversy" requirement mandates that the case be viable at all stages of the litigation; "it is not sufficient that the controversy was live only at its inception." *C & C Products, Inc.,* 700 F.2d at 636.

Second, we have found no authority for the proposition that a federal court may modify the terms of a voluntary settlement agreement between parties before a decree has been entered. In *Evans v. Jeff D.,* 475 U.S. 717, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986), the Supreme Court explained the role of the district court in reviewing settlements in class actions:

> Rule 23(e) wisely requires court approval of the terms of any settlement of a class action, but the power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed. Although changed circumstances may justify a court-ordered modification of a consent decree over the objections of a party after the decree has been entered, ... Rule 23(e) does not give the court the power ... to modify a proposed consent decree and order its acceptance over either party's objection.

*Id.* at 726-27, 106 S.Ct. at 1537 (footnotes omitted). Similarly, the duty of an appellate court is simply to ascertain whether or not the trial judge clearly abused his discretion in approving or

rejecting a settlement agreement. *Cotton v. Hinton,* 559 F.2d 1326, 1333 (5th Cir.1977).[6] "We are not free to delete, modify or substitute certain provisions of the settlement. The settlement must stand or fall as a whole." *Id.* at 1331-32. *Accord Jeff D. v. Andrus,* 899 F.2d 753, 758 (9th Cir.1989) ("[C]ourts are not permitted to modify settlement terms or in any manner to rewrite agreements reached by parties."); *In re Warner Communications Securities Litigation,* 798 F.2d 35, 37 (2d Cir.1986) ("[I]t is not a district judge's job to dictate the terms of a class settlement; he should approve or disapprove a proposed agreement as it is placed before him and should not take it upon himself to modify its terms.").

In light of this clear precedent, we are convinced that neither this court nor the district court has the power to modify the effective dates in the proposed settlement agreement in order to afford meaningful relief and escape the jurisdictional bar of mootness. *See Gilpin v. American Fed'n of State, County, and Mun. Employees, AFL-CIO,* 875 F.2d 1310, 1313 (7th Cir.) ("Even the United States Court of Appeals ... cannot make time run backwards."), *cert. denied,* 493 U.S. 917, 110 S.Ct. 278, 107 L.Ed.2d 258 (1989). Moreover, even if we had the power to modify the dates in the agreement as Plaintiffs suggest, we conclude that it would be inappropriate to impose a settlement that has expired by its own terms on parties no longer in agreement on the propriety

---

[6]In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

of the settlement. *Cf. Thibaut v. Ourso,* 705 F.2d 118, 121 (5th Cir.1983) (dismissing appeal as moot and stating that plaintiff "cannot ask this Court to reconstruct a legal and financial puzzle which is now missing several pieces"). We have no way of reading the minds of the parties to ascertain their evaluation of the circumstances under which they settled or the importance of the discrete terms of the agreement, including the date-specific provisions involved in the proposed settlement. Thus, we decline Plaintiffs' invitation to modify the terms of the agreement to save this appeal from mootness. Accordingly, because we cannot afford meaningful relief in this case, we conclude that this appeal must be dismissed as moot unless it falls within a specific exception to the mootness rule.

There are several well-established exceptions to the mootness doctrine. First, a case is not moot where the issue raised is "capable of repetition, yet evading review." *See, e.g., Naturist Soc'y, Inc. v. Fillyaw,* 958 F.2d 1515, 1520 (11th Cir.1992) (citations omitted). This exception allows a court to reach the merits of a case which is otherwise moot if (1) there is a "'reasonable expectation' or a 'demonstrated probability' that the same controversy will recur involving the same complaining party," and (2) the "challenged action was in its duration too short to be fully litigated prior to its cessation or expiration." *The News-Journal Corp. v. Foxman,* 939 F.2d 1499, 1507 (11th Cir.1991) (quoting *Murphy v. Hunt,* 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982) (per curiam)). Thus, "[a] controversy is not capable of repetition if there is only "a mere physical or theoretical

possibility' of recurrence."   *C & C Products,*   700 F.2d at 637 (citations omitted).

This exception is inapplicable in the present case.  The issues in this case are *theoretically* capable of repetition, in that the parties could propose a new settlement agreement with similar terms of questionable constitutional validity.  In light of the changed circumstances (including the declaratory judgment in favor of the state in the Section 5 action), however, we deem it extremely unlikely that the state will settle the Section 2 action again and cause an identical dispute over the validity of a settlement agreement.[7]  Consequently, this case does not manifest "a demonstrated probability that the same controversy will recur, involving the same complaining party." *Murphy,* 455 U.S. at 482, 102 S.Ct. at 1183.

In addition, we are not persuaded that the issues in this case "evade review."  First, we note that the issues in this appeal evade review only because of date-specific provisions set voluntarily by the parties.  Thus, while it is true that this particular appeal was mooted before the issues raised could be addressed, it does not follow "that similar future cases will evade review." *Neighborhood Transp. Network, Inc. v. Pena,* 42 F.3d 1169, 1173 (8th Cir.1994).  A dismissal of this appeal as moot would not preclude the parties from proposing a new settlement agreement with different terms and litigating the issue of its validity in a

---

[7]At oral argument, counsel for the state assured this court that in light of the intervening decision of the District Court for the District of Columbia in *Georgia v. Reno,* see *supra* note 3, the state "certainly has no interest" in reaching another settlement in the Section 2 action.

subsequent appeal. There is no reason to expect that any subsequent agreement by the parties would necessarily include stringent time limitations likely to expire before an appeal could be heard. Accordingly, "we do not believe this type of claim is inherently of such short duration that it consistently will evade future appellate consideration." *Pacific Ins. Co.,* 28 F.3d at 1097. Furthermore, the district court retained jurisdiction of the case, which may be litigated on the merits and the outcome appealed should the parties choose to take that route. *See Tropicana,* 874 F.2d at 1583 (holding that the case did not "evade review" where the trial court still had the opportunity to address the merits of the case). For these reasons, we conclude that the rare exception for issues "capable of repetition, yet evading review" is inapplicable in the present case.

Another exception to mootness applies where "an appellant has taken all steps necessary to perfect the appeal and to preserve the status quo before the dispute becomes moot." *B & B Chemical Co. v. EPA,* 806 F.2d 987, 990 (11th Cir.1986). "This exception, however, is an extremely narrow one that has been limited primarily to criminal defendants who seek to challenge their convictions notwithstanding that they have been released from custody." *Ethredge,* 996 F.2d at 1176-77 (footnote omitted). Therefore, the "all necessary steps" exception does not save the appeal in this case from dismissal for mootness.

A third exception to the doctrine of mootness allows review of an otherwise-moot case if the district court's order will have dangerous collateral consequences if not reversed. *See, e.g., B &*

*B Chemical Co.,* 806 F.2d at 990. There is no such danger in the present case, however, as the district court's order is limited to the specific terms of the settlement agreement. Thus, no collateral consequences are present to warrant an exception to mootness in this case.

In summary, Plaintiffs have not articulated a persuasive argument against dismissing this appeal as moot. Alternatively, they contend that "[w]hether or not the settlement agreement could be implemented in the event of a reversal by this Court is essentially a factual determination which could best be determined in the first instance by the district court." Appellants' Reply Brief at 2. Thus, Plaintiffs propose that, in the event of a reversal, this court should "remand for implementation of the agreement, or with directions for the district court to withhold approval of the agreement in the event it found the settlement to be moot after the parties have the opportunity to develop a current record going to that issue." *Id.*

We reject this argument. First, mootness is a threshold jurisdictional inquiry. As discussed above, "Article III denies federal courts the power "to decide questions that cannot affect the rights of the litigants in the case before them.' " *Lewis,* 494 U.S. at 477, 110 S.Ct. at 1253 (quoting *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971)). It would be clearly improper for us to ignore the obvious mootness issue in this case, decide the merits of the appeal, and then remand to the district court for an after-the-fact determination of whether a case or controversy exists to give us jurisdiction. In addition,

we believe it unnecessary to remand to the district court for a "factual determination" of whether the settlement agreement could be implemented, as it is apparent from the dates in the agreement that the state cannot possibly comply with its terms. Therefore, we reject Plaintiffs' suggestion that we remand to the district court to determine the mootness issue. Instead, based on the expired terms of the proposed agreement at issue, we conclude that we cannot afford meaningful relief in this case, that no exception to the mootness doctrine applies, and that this appeal is therefore moot and ought to be dismissed.

## III.

As a general rule, "[w]hen a case becomes moot after the district court enters its judgment but before this court has issued a decision, we are divested of jurisdiction and must dismiss the appeal and vacate the underlying judgment." *Ethredge*, 996 F.2d at 1175 (citations omitted). In the case of interlocutory appeals, however, "the usual practice is just to dismiss the appeal as moot and not vacate the order appealed from." *In re Tax Refund Litigation*, 915 F.2d 58, 59 (2d Cir.1990) (citations omitted); *see also* 13A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3533.10, at 435-36 (2d ed. 1984). We have followed this practice and dismissed moot appeals without vacating the underlying district court order in cases involving appeals from preliminary injunctions and interlocutory orders. *See, e.g., Pacific Ins. Co.*, 28 F.3d at 1097; *Tropicana*, 874 F.2d at 1584; *C & C Products*, 700 F.2d at 638. Accordingly, we dismiss the appeal as moot, but we do not vacate the district court's order.

We emphasize that our dismissal of this appeal as moot is necessarily limited to the specific order before us: the district court's rejection of the proposed settlement agreement. *See Ethredge,* 996 F.2d at 1175. Still pending before the district court is the broader issue of the merits of Plaintiffs' Section 2 claim.

For all of the foregoing reasons, Plaintiffs' appeal is DISMISSED, and the case is REMANDED to the district court for further proceedings consistent with this opinion.

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF GEORGIA BRUNSWICK DIVISION

Tyrone Brooks, et al., Plaintiffs,

v.

State Board of Elections, et al., Defendants.

Civil Action File No. CV288-146

*CONSENT DECREE*

This matter comes before the Court for judicial approval of a settlement entered into between the parties in the above captioned case.

A. *Introduction*

*Brooks v. Georgia State Board of Elections,* Civ. No. CV288-146 (S.D.Ga.) (hereinafter "*Brooks* I") was filed on July 13, 1988, alleging violations of Sections 2 and 5 of the Voting Rights Act, 42 U.S.C. § 1971, *et seq.,* as well as the First, Thirteenth, Fourteenth and Fifteenth Amendments of the Constitution of the United States, in the manner in which the State of Georgia elects its superior court judges.

*Brooks v. Miller,* Civ. No. 1:90-CV-1001-RCF (N.D.Ga.) (hereinafter "*Brooks* II"), was filed on May 8, 1990, alleging that the use of a majority vote requirement for federal, state, and county elections in Georgia, O.C.G.A. § 21-2-501, was in violation of Section 2 and the First, Thirteenth, Fourteenth and Fifteenth Amendments of the Constitution of the United States.

The courts have jurisdiction of the above described actions pursuant to 42 U.S.C. §§ 1971(d), 1973j(f) and 28 U.S.C. §§ 1331, 1343, 2201 and 2202.

B. *Parties*

1. *Brooks I*

The plaintiffs in *Brooks I* are twenty-two (22) black citizens and voters from throughout the State of Georgia. They allege that the use of at-large, numbered post elections for superior court judges, using a majority vote requirement, violates both Sections 2 and 5 of the Voting Rights Act. They also challenge the manner in which certain judicial circuits are drawn. Further, they allege that the State of Georgia has illegally implemented numerous statutes creating additional superior court judgeships, without first obtaining preclearance from the United States Department of Justice or the United States District Court for the District of Columbia. Since the filing of the complaint, plaintiffs have broadened their challenge to include the statewide method of electing appellate court judges, *i.e.,* the judges of the court of appeals and supreme court, and the at-large method of electing state court judges.

Defendants are the Secretary of State and the Georgia Board of

Elections, who are charged with the responsibility for supervising the conduct of elections for judges of the superior court in the various circuits throughout the state.

2. *Brooks II*

The plaintiffs in *Brooks II* are twenty-seven (27) black citizens and voters throughout Georgia, and include the plaintiffs in *Brooks I.* They allege that the statewide majority vote requirement was adopted in 1964 with a racially discriminatory purpose, and that it has a discriminatory result in violation of Section 2 and the Constitution.

Defendants are the Governor, the Georgia Board of Elections, the Secretary of State, and the Constitutional Officers Election Board, who have the duty of administering and implementing the statewide majority vote requirement, and the DeKalb County, Georgia Board of Elections, and the Superintendent of Elections of DeKalb County, who were sued on their own behalf and as representatives of a class consisting of other boards and entities in Georgia which administer and implement the statewide majority vote requirement in their respective counties.

C. *Course of Relevant Proceedings to Date*

1. *Brooks I*

Between 1964 and 1988, Georgia enacted 80 statutes regarding the election of superior court judges. All told, seventy-seven judgeships and five new circuits were created. The judgeships and new circuits were implemented by the state shortly after enactment.

On June 27, 1988 the State submitted these statutes to the Attorney General for preclearance. By letter of August 26, 1988

the Attorney General notified the State he did not object to thirty-one of the proposed changes, and requested additional information regarding the remaining changes. The State elected instead to litigate the question of Section 5 coverage in the *Brooks I* court rather than complete the administrative submission. Because that submission was not completed, the Attorney General objected to the remaining pending statutes on June 16, 1989, at which time none of the additional requested information had been submitted.

On May 16, 1989, plaintiffs filed a motion for preliminary injunction, seeking to enjoin any further implementation of these unprecleared statutes. By order of December 1, 1989, the court gave defendants thirty (30) days within which to submit the information requested by the Attorney General and ordered that no further appointments or elections could be made as to 48 judgeships until preclearance was obtained. *Brooks v. Georgia State Board of Elections,* 775 F.Supp. 1470, 1482-83 (S.D.Ga.1989).

The State of Georgia provided the requested information to the Attorney General within the time frame set by the court. On April 25, 1990, the Attorney General entered an objection on the merits to all 48 judgeships, finding that the state had not carried its burden of proving that the changes had neither a discriminatory purpose nor discriminatory effect. A copy of that objection letter is a part of the stipulated evidence in the record in these cases.

By order of May 29, 1990, as amended on June 25, 1990, the court provided that incumbent judges could continue to hold office until the preclearance question was finally resolved in the United

States District Court for the District of Columbia, but continued the bar against appointment or election as to those judgeships which had not yet been precleared. The orders of the court finding that the disputed voting practices were covered by Section 5, and implementing a remedy, were affirmed by the Supreme Court. *Brooks v. Georgia State Board of Elections,* 498 U.S. 916, 111 S.Ct. 288, 112 L.Ed.2d 243 (1990), and *Georgia State Board of Elections v. Brooks,* 498 U.S. 916, 111 S.Ct. 288, 112 L.Ed.2d 243 (1990). Although a declaratory judgment action was filed by the state in the U.S. District Court for the District of Columbia, *Georgia v. Barr,* C.A. No. 90-2065 (D.D.C.), no preclearance has been obtained as of this date as to a total of 62 judgeships.

No proceedings have yet been held as to plaintiffs' claims under Section 2 of the Voting Rights Act.

2. *Brooks II*

The statewide majority vote requirement provides in relevant part that "no candidate shall be nominated for public office in any primary or elected to public office in any election unless such candidate shall have received a majority of the votes cast to fill such nomination or public office." O.C.G.A. § 21-2-501. The statute applies to all federal, state, and county elections, except the general election for Governor, in which a majority vote requirement is separately provided for by Ga.Laws 1968, pp. 977 and 1562. A majority vote requirement is also in effect for municipal elections by virtue of Ga.Laws 1968, p. 885, O.C.G.A. § 21-3-407, except for those municipalities whose charters provide otherwise. The plaintiffs in *Brooks II* did not challenge the majority vote

requirement for municipal elections, nor did they challenge the use of a majority vote requirement pursuant to a court ordered or court approved district election plan adopted subsequent to the enactment of the state wide majority vote rule.

Plaintiffs filed a motion for a preliminary injunction against further use of the majority vote requirement on May 31, 1990, on the ground that the requirement was adopted with a racially discriminatory purpose and had a racially discriminatory effect in violation of Section 2. After conducting an evidentiary hearing July 9-14, 1990, the court denied the motion on July 17, 1990. The court denied injunctive relief, *inter alia,* on the ground that "such relief would not be in the public interest at this point in the election cycle." (Order at 14)

On July 17, 1990, the court entered an order certifying the case as a class action on behalf of all present and future black registered voters of Georgia. On November 14, 1990, the court entered a further order with the consent of plaintiffs dismissing the DeKalb County defendants based upon the stipulation by the state defendants that they would enforce any outstanding order of the court that awarded plaintiffs relief, not only in the election of statewide officers but also in the election of county offices affected by the majority vote requirement. Dismissal of those local defendants was without prejudice to their being added later and with plaintiffs reserving the right to move for defendants' class certification in that event.

On August 9, 1990, the United States filed a similar challenge to the statewide majority vote requirement, *United States v.*

*Georgia,* Civ. No. 1:90-CV-1749 (N.D.Ga). The defendants were essentially identical in both cases, except that the State of Georgia was named as a defendant in *United States v. Georgia, supra,* and not in *Brooks II.* The Dekalb County defendants have also been retained in the United States' case, and those defendants have become representatives of a class of local defendants.

The United States requested an injunction against further use of the majority vote requirement in those jurisdictions where the majority vote requirement produces discriminatory results or where, absent discriminatory results, no legitimate non-racial overriding governmental purpose exists for the continued use of the requirement. Upon motion of the plaintiffs in *Brooks II,* the two majority vote cases were consolidated by order of the court on December 21, 1990. A proposed pretrial order was filed by the parties in the consolidated cases on February 28, 1992, but the court has not entered a pretrial order as of this date.

On July 16, 1992, upon joint motion of the parties in *Brooks II,* which was unopposed by the United States, the court entered an order designating the Honorable Anthony A. Alaimo, Senior Judge for the U.S. District Court for the Southern District of Georgia, to serve as a mediator to mediate toward a successful settlement of the judicial selection and majority vote cases.

D. *The Course of Settlement Dealings Between the Parties.*

On many occasions, the *Brooks* plaintiffs and representatives of the State of Georgia have met to discuss the possibility of settling the claims asserted in these cases. Those discussions become particularly earnest at the time of the 1990 session of the

General Assembly.  However, notwithstanding the extended good faith efforts of the parties in search of possible settlements, it was not until 1992 that the parties' efforts yielded an agreement that could be the basis of resolving their disputes.  As a practical matter, the success of the settlement discussions in 1992 coincided with the efforts of the Honorable Anthony A. Alaimo to serve as a mediator between the parties.  Under Judge Alaimo's guidance and direction, the *Brooks* plaintiffs' representatives met with the representatives of the State on a number of occasions from April, 1992 to June, 1992, when all concerned explored a variety of possible ways of resolving the parties' claims, defenses and legitimate interests.  An agreement was ultimately reached between the *Brooks* plaintiffs and the State on June 17, 1992, and the terms of their agreement is reflected in the June 17, 1992 Settlement Memorandum of Michael J. Bowers and Laughlin McDonald to the Honorable Anthony A. Alaimo, which has been signed by Attorney General Bowers and Governor Miller on behalf of the State, and by Laughlin McDonald, Tyrone Brooks and others on behalf of the plaintiffs.  This agreement is part of the stipulated evidence before the court.

As set forth in that Settlement Memorandum, the settlement itself is contingent upon the United States' approval and concurrence with the settlement regarding both the method of electing Georgia's judges and disposition of the majority vote claims.  Pursuant to the June 17, 1992 Settlement Memorandum and the *Brooks II* court's official designation of Judge Alaimo as a mediator in the majority vote cases, further negotiations took

place between the United States and the State of Georgia. Those negotiations produced a final Agreement on July 29, 1992 between those parties that was signed by Attorney General Bowers on behalf of the State of Georgia and by John R. Dunne, Assistant Attorney General, Civil Rights Division, Department of Justice, for the United States of America. That Agreement provides terms for the resolution of the claims between the United States and the State of Georgia. It, too, is part of the stipulated evidence before the court.

E. *The Terms of Settlement.*

By entering into this Consent Decree, defendants make no admission of liability and specifically deny plaintiffs' allegations and claims. At the same time, the defendants and plaintiffs acknowledge that, in their respective opinions based on the advice of their counsel, neither party is certain of prevailing on any particular claim or defense in this action. The parties hereto are desirous of ending the lawsuits pending between them, and other lawsuits between the State of Georgia, its officers, and the United States (to which the *Brooks* plaintiffs are not parties). To that end, all of the parties hereto have agreed to resolve the *Brooks I* and *Brooks II* class actions on the following terms and conditions.

1. The complaint in *Brooks I* is hereby amended to allege that the use of at-large, numbered-post elections for appellate court judges, those of the Court of Appeals and the Supreme Court, and for state court judges, using a majority vote requirement, violates Section 2 of the Voting Rights Act.

2. By December 31, 1994, there will be a total of no fewer than 25 black superior court judges serving, which would be a total derived from (1) those serving in existing seats, (2) those serving in enacted but unfilled (frozen) seats, (3) persons appointed to the State Assignment Judgeships, and (4) persons appointed to newly enacted seats in existing circuits prior to December 31, 1994. In addition, by December 31, 1994, five other black persons will be appointed to either state or superior court seats in addition to the number serving as of June 17, 1992.

3. Superior court, state court, and appellate court judges will be subject only to "retention" elections after this order takes effect. That is, any judge who seeks an additional term for the same judicial office will be retained in office by vote of the electorate. The retention election will be nonpartisan, will be held at the time of the regular general election, and will require the affirmative vote of a majority of those voting on the question to retain the judge. The question submitted to the electorate will be substantially in the following form: "Shall ___ be retained as [justice] [judge] of the ___ court for ___ years? ___ yes ___ no."

4. Future appointments to the superior courts shall serve no less than two years prior to standing for a retention election.

5. The present Judicial Nominating Commission (JNC) will be increased by two persons, to serve until December 31, 1994, one of whom will be one of the attorneys for the plaintiffs, and the other of whom will be chosen by the Governor from a list of four names that the plaintiffs will give to the Governor. These names may include the plaintiffs.

6. The Governor and the JNC will be responsible for affirmative outreach to fill existing and upcoming vacancies and the JNC will assist in the implementation of this agreement.

7. In the event any vacancies occur by virtue of a "no vote" in a retention election held prior to December 31, 1994, or in the first retention election for any judge appointed pursuant to Paragraph E(2) of this Order, the then-existing JNC, but augmented pursuant to Paragraph E(5) of this Order, will be responsible for making recommendations to the Governor for the filling of those vacancies.

8. A special category of superior court judges will be created known as State Assignment Superior Court Judgeships, and this category of judges shall exist for a period not to exceed 10 years. Qualified minority lawyers will be appointed as such judges by the Governor, upon review and recommendation by the JNC. State assignment judges will be authorized to serve, by assignment, in any circuit in the state.

9. Gubernatorial appointment will be limited to JNC recommendations until such time as the court's jurisdiction terminates pursuant to Paragraph E(16) of this Order.

10. A new executive order shall be promulgated concerning the JNC, its functions, objectives, and composition, after January 1, 1995, and those portions of that order that are germane to the resolution of the issues in this case shall be adopted and made an order of the court in *Brooks I,* such order to terminate when the Jurisdiction of this court terminates under Paragraph E(16) of this Order. If the parties are unable to agree on the terms of such an

order, these differences shall be resolved by the Honorable Anthony A. Alaimo pursuant to Paragraph E(13) of this Order. In the event that the State Bar of Georgia is appointed an ex-officio member of the JNC, then the President of the Georgia Alliance of African-American Attorneys shall be appointed ex officio to the JNC.

11. Subsequent to January 1, 1995, the Judicial Nominating Commission shall make recommendations for the superior, state and appellate courts to the Governor without regard to race, color or ethnic origin and the members thereof shall be specifically prohibited from discriminating on the basis of race in making said recommendations.

12. Subsequent to January 1, 1995, the Governor of the State of Georgia shall make his/her appointments to the superior, state, and appellate courts without regard to race, color or ethnic origin and he/she shall be prohibited from discriminating in appointments on the basis of race.

13. The Honorable Anthony A. Alaimo shall serve as an arbitrator of disputes concerning the enforcement of this order, until jurisdiction is terminated pursuant to Paragraph E(16) of this order, and in the event of the inability of Judge Alaimo to so serve, the court shall appoint a successor or substitute to Judge Alaimo. Judge Alaimo shall specifically have the authority to oversee the actions of the JNC and the Governor with regard to the appointment of judges under the terms of the order, and he shall be empowered with regard to those appointments occurring on or after January 1, 1995 to review the recommendations and appointments of the JNC and the Governor to ensure that said actions have been made

without discrimination on the basis of race, color or ethnic origin. The specific right of the plaintiffs to challenge the actions of the JNC or of the Governor hereunder does not contemplate the right to "second guess" individual appointments, but rather the right of the plaintiffs to challenge the actions of the JNC or the Governor because of a pattern of appointing white applicants over equally or more qualified black applicants.

14. There shall be no residency requirement for appointment to the superior court bench other than residency within the circuit at the time of taking office and the existing requirement prescribed by law concerning residency within the State of Georgia.

15. The goal of the State of Georgia is a diverse judiciary reflective of the population of the State as a whole.

16. The jurisdiction of the court in *Brooks I* shall terminate upon the State achieving a racially diverse appellate, superior and state court bench which shall be reasonably representative of the population of the State as a whole considering among other factors the percentage of African-American attorneys eligible to serve as judges. The State may petition the court for an end to its jurisdiction at any time it deems it has complied with this paragraph.

17. A class action on behalf of all present and future black voters in the State of Georgia has already been certified in both *Brooks I* and *Brooks II.*

18. The plaintiffs' claims in *Brooks I* are hereby dismissed with prejudice. This dismissal, however, does not preclude the plaintiffs from making claims under Section 2 to the system of

nominations, appointments, and retention elections that are established pursuant to this Consent Decree. No such challenge, however, may be brought before all judges appointed on or before December 31, 1994 have gone through at least one retention election.

19. This consent decree is conditioned upon approval of a consent decree in *Brooks II* incorporating the terms of the settlement agreement between the parties that relate to the majority vote issues. Specifically, that would include the dismissal of the complaint in *Brooks II* with prejudice, provided that such dismissal would not include the plaintiffs' claim involving use of a majority vote requirement for all offices that are elected state-wide, which claim would remain pending upon entry of said decree. That remaining claim, however, would also be deemed dismissed with prejudice unless plaintiffs file a written demand for trial no sooner than December 31, 1994 and no later than June 15, 1995.

20. This Consent Decree is further conditioned upon the entry of a judgment of dismissal with prejudice of the complaint that has been brought by the United States for the Northern District of Georgia involving its challenge to the use of the majority vote requirement in Georgia; provided, however, said dismissal with prejudice shall not include the United States' claims involving use of the majority vote requirement for all offices elected state-wide and for all offices elected at-large on a countywide basis. Those additional claims, however, would also be deemed dismissed with prejudice unless the United States files a written demand for trial

no sooner than December 31, 1994 and no later than June 15, 1995.

21. Upon notification by the parties that the conditions specified in the foregoing paragraphs 19 and 20 have been satisfied, the court will enter an appropriate order making this consent decree the final judgment of the court.

SO ORDERED this __ day of _____, 1994.

_ _ _ _ _ _ _

UNITED STATES DISTRICT

JUDGE

CONSENTED TO:

/s/ M. Laughlin McDonald M. Laughlin McDonald Counsel for Plaintiffs ACLU Foundation, Inc. 44 Forsyth Street, N.W. Suite 202 Atlanta, Georgia 30303 404/523-2721

MICHAEL J. BOWERS Attorney General of the State of Georgia Georgia Bar No. 071650

CAROL ATHA COSGROVE Senior Assistant Attorney General Georgia Bar No. 189150 132 State Judicial Building Atlanta, Georgia 30334 404/656-2647

WALBERT & HERMANN

By: /s/ David F. Walbert David F. Walbert Georgia Bar No. 730450 100 Peachtree Street Suite 1010 Atlanta, Georgia 30303 404/523-5000

Attorneys for State Defendants