# In re Jorge LUIS-Rodriguez, Respondent

## File A26 173 250 - Krome

*Decided May 26, 1999*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) Section 241(a)(4)(A)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(4)(A)(i) (1994), which provides for the deportability of any alien who after entry has engaged in "any activity to violate any law of the United States relating to espionage," does not require evidence that the alien was either engaged in an act of espionage or was convicted of violating a law relating to espionage.

(2) An alien who has knowledge of, or has received instruction in, the espionage or counterespionage service or tactics of a foreign government in violation of 50 U.S.C. § 851 (1994) is deportable under section 241(a)(4)(A)(i) of the Act.

Ira J. Kurzban, Esquire, Miami, Florida, for respondent

Daniel N. Vara, Jr., District Counsel, for the Immigration and Naturalization Service

Before: Board En Banc: DUNNE, Vice Chairman; HEILMAN, HOLMES, HURWITZ, FILPPU, COLE, MATHON, JONES, and GRANT, Board Members. Concurring and Dissenting Opinion: GUENDELSBERGER, Board Member, joined by SCHMIDT, Chairman. Dissenting Opinion: VACCA, Board Member, joined by ROSENBERG, Board Member.

HEILMAN, Board Member:

In a decision dated November 25, 1996, an Immigration Judge terminated deportation proceedings against the respondent, finding that the Immigration and Naturalization Service had failed to meet its burden of proving the respondent's deportability on the charges against him. The Service has appealed from that decision, challenging only the Immigration Judge's finding as to the respondent's deportability under section 241(a)(4)(A)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(4)(A)(i) (1994). The appeal will be sustained, and the record will be remanded to the Immigration Court for further proceedings consistent with this decision.

## I. BACKGROUND

### A. Alleged Grounds of Deportability

The respondent is a 55-year-old native and citizen of Cuba who is a known agent of the Cuban Intelligence Service ("CUIS"). The respondent entered the United States on September 3, 1983, as the beneficiary of a fiancé immigrant visa petition. On December 12, 1983, the respondent adjusted his status to that of a lawful permanent resident on the basis of his marriage to a United States citizen.

On April 23, 1996, the Service issued an Order to Show Cause and Notice of Hearing (Form I-221), charging the respondent with deportability under section 241(a)(4)(A)(i) of the Act, as an alien who after entry has engaged in "any activity to violate any law of the United States relating to espionage."[1] Specifically, the Service asserts that the respondent violated 50 U.S.C. § 851 (1994). This registration statute provides as follows:

> Except as provided in section 852 of this title,[2] every person who has knowledge of, or has received instruction or assignment in, the espionage, counter-espionage, or sabotage service or tactics of a government of a foreign country or of a foreign political party, shall register with the Attorney General by filing with the Attorney General a registration statement in duplicate, under oath, prepared and filed in such manner and form, and containing such statements, information, or documents pertinent to the purposes and objectives of this subchapter as the Attorney General, having due regard for the national security and the public interest, by regulations prescribes.

50 U.S.C. § 851.

### B. Facts and Evidence Adduced Below

The central facts of this case are not in dispute. On April 1, 1996, special agents of the Federal Bureau of Investigation and the Service—from a joint task force on foreign counterintelligence in South Florida—interdicted a clandestine meeting between the respondent and another CUIS agent in Miami. The record reflects that the respondent has served the CUIS as an "agent handler" who receives instructions from senior CUIS agents via tele-

---

[1] The Service subsequently lodged an additional charge of deportability against the respondent as an alien who procured lawful permanent residence through fraud in that he failed or refused to fulfill his marital agreement which was made solely for the purpose of procuring entry into the United States. The Immigration Judge held that the Service had failed to sustain this additional charge. The Service did not appeal the Immigration Judge's finding.

[2] This section enumerates specific exemptions from the registration requirements of 50 U.S.C. § 851, none of which applies to the respondent. 50 U.S.C. § 852 (1994).

phone and "dead drops," surreptitiously relays further instructions to other CUIS agents, and then receives intelligence gathered by CUIS agents and furnishes the intelligence back to the senior CUIS agents.

When approached and interviewed by the FBI and the Service, the respondent had in his possession several items of "spy trade-craft." Contained in a concealed compartment in his billfold were four sheets of water soluble paper on which particular CUIS instructions were written detailing a specific intelligence gathering mission that the respondent was to relay to the Miami CUIS agent. The instructions listed several names of Cuban exiles who are members of an anti-Castro paramilitary organization, the Partido de Unidad Nacional Democratico ("PUND"), operating in South Florida. In addition, at the time of the apprehension, the respondent was in possession of two audio tape recorders to record the meeting with the other CUIS agent in Miami.

During his subsequent interviews with the FBI and Service agents in Miami and New York City, the respondent admitted that he was a CUIS agent. He related that he had received the instructions for the Miami mission via a "dead drop" site in Central Park in New York. Accompanying the instructions was $700 in cash to facilitate the mission. The respondent produced his airline ticket which showed that he had flown from New York to Miami the preceding day and that he had a return flight on April 2, 1996. The respondent also produced his billfold, which contained five $100 bills. Hidden in a secret compartment within the wallet, which the respondent showed the agents how to open, were four water soluble sheets of paper. These papers contained the questions from the CUIS which the respondent was directed to ask the other agent. The respondent stated that he never read the questions, but immediately secreted them until he was in the area to conduct the intelligence-gathering.

The object of the respondent's mission was to tape-record an interview with the other CUIS agent and return the tapes to his CUIS handlers. The respondent would use the two tape recorders, one micro cassette recorder and a standard size recorder, to tape his interview with the other CUIS agent, then return the tapes as part of his reporting for CUIS. The respondent and the other agent would go to a hotel room where he would conduct the debriefing. He would then stay in the hotel overnight and depart the next day. Upon returning to New York he would secrete the audio tapes in a dead drop at a predetermined location in New York City. The respondent also had in his possession several credit cards, a padlock, and various business cards. In addition, the respondent informed the FBI that he possessed a radio used exclusively for receiving radio communications from Cuba.

The respondent denied having received training from the CUIS and stated that he had not returned to Cuba since arriving in the United States. An FBI counterintelligence expert, however, testified below that in his opinion, the respondent had received training from the CUIS and that the

respondent "had knowledge of the tactics of the [CUIS]."

In his defense, the respondent asserted that the target of his information gathering were members of PUND. The respondent presented various news articles and human rights reports, in addition to the testimony of expert witnesses, which demonstrated that paramilitary groups and terrorism exist in the Cuban-American community. The respondent's witnesses attested that these groups are comprised of either persons who were disaffected by the Castro regime or who have been trained by the United States Government to invade Cuba. According to the witnesses, PUND has engaged in violent activities both in the United States and abroad against those who allegedly support Cuba and the Castro regime and, in fact, has been prosecuted by the United States Government for violations of the Neutrality Act.

## II. IMMIGRATION JUDGE'S DECISION

The Immigration Judge held that the Service did not sustain its burden of demonstrating by clear, unequivocal, and convincing evidence that the respondent had violated 50 U.S.C. § 851 and was therefore deportable under section 241(a)(4)(A)(i) of the Act. The Immigration Judge ruled that while 50 U.S.C. § 851 is a law "relating to espionage" for purposes of section 241(a)(4)(A)(i), the record did not clearly show that the respondent necessarily was engaged in "espionage."

In reaching this conclusion, the Immigration Judge relied to a great degree on the traditional definition of "espionage" which the courts, beginning with *Gorin v. United States*, 312 U.S. 19 (1941), have developed in construing various statutes aimed at preserving our national security. To be considered to have been in violation of 50 U.S.C. § 851, the Immigration Judge held, the Service was obliged to show that the respondent was secretly gathering or obtaining sensitive defense-related or classified information from the United States Government with the intent of injuring the United States or benefiting a foreign nation. In the Immigration Judge's view, the respondent was gathering information concerning PUND and other paramilitary, anti-Castro organizations in South Florida, not sensitive or classified information directly related to the national defense of the United States. Accordingly, the Immigration Judge terminated deportation proceedings.

## III. MOOTNESS AND WITHDRAWAL ISSUE

The threshold issue before us is whether the Service's appeal has been rendered moot or effectively withdrawn by the respondent's departure from the United States to Cuba during the pendency of the appeal. The record reflects that on December 6, 1996, the respondent filed a Petition for Writ

of Habeas Corpus with the United States District Court for the Southern District of Florida. On January 27, 1997, the district court indicated that it would be granting the petition for habeas corpus and directed the parties to discuss the conditions of the respondent's release from Service custody.

In a joint stipulation executed on January 30, 1997, the parties stipulated, in pertinent part, to the following:

> [The respondent] shall depart from the United States and proceed directly to his native country of Cuba. He shall remain in Cuba during the pendency of the Immigration and Naturalization Service's (INS) appeal of the November 25, 1996 Order of [the] Immigration Judge . . . terminating [the respondent]'s deportation proceedings. Further, [the respondent] agrees to remain in Cuba during the pendency of any referral of his case to the Attorney General, pursuant to 8 C.F.R. § 3.1(h) (January 1, 1995).

> The INS will verify [the respondent's] departure from the United States by using any reasonable method, such as an escort, to ensure [the respondent] has been repatriated to Cuba.

> [The parties] agree that in the event [the respondent] is successful in the INS' appeal of his case, he will not be subject to further deportation, exclusion, or other immigration-related removal proceedings pursuant to any law which could have been applied to [the respondent] at the time of commencement of the instant deportation case . . . . However, should the immigration laws change, or should [the respondent] engage in additional activities which would subject him to prosecution under the immigration laws of the United States, this agreement will not preclude such an action. This provision is intended to prevent the relitigation of any factual or legal issue which was ripe for consideration under Title 8, United States Code, at the time that the instant deportation case was instituted.

Joint Stipulation Regarding Conditions of Release, *Rodriguez v. Wallis*, No. 96-3518-CIV-DAVIS (S.D. Fla. 1997). Both the Service and the respondent's counsel have indicated that the respondent is now in Cuba.

The respondent, through counsel, argues that his departure from the United States to Cuba renders moot the Service's appeal of the Immigration Judge's order terminating deportation proceedings. The respondent maintains that "there is no issue in regard to [his] deportation as he has departed the United States." According to the respondent, because he is not the appealing party, "his departure cannot be construed as a withdrawal of his appeal under 8 C.F.R. § 3.4. nor can it be construed as self-deportation because he [prevailed in] this case [before the Immigration Judge] and was not ordered deported."

The Service, on the other hand, contends that the respondent's departure does not affect its appeal or the Board's jurisdiction to hear it. According to the Service, the provisions of 8 C.F.R. § 3.4 (1999) at issue here pertain solely to appeals filed by an alien, not those submitted by the Service. Otherwise, the Service contends, an alien would be able to control the Service's ability to pursue an appeal and "to avoid a potentially adverse decision [by the Board] merely by departing."

The respondent's departure from the United States during the pendency of the Service's appeal gives rise to two distinct issues to be addressed. The first is whether the respondent's departure from this country constituted a constructive withdrawal of the Service's appeal pursuant to 8 C.F.R. § 3.4. The second is whether the respondent's departure rendered the Service's appeal moot. *See Matter of Keyte,* 20 I&N Dec. 158, 159 (BIA 1990) (distinguishing withdrawal of appeal and mootness of appeal issues). We will address these issues in turn.

## A. Respondent's Departure from the United States Is Not a Constructive Withdrawal of the Service's Appeal Under 8 C.F.R. § 3.4

The regulations at 8 C.F.R. § 3.4 instruct, in relevant part, that the "[d]eparture from the United States of a person who is the subject of deportation proceedings subsequent to the taking of an appeal, but prior to a decision thereon, shall constitute a withdrawal of the appeal, and the initial decision in the case shall be final to the same extent as though no appeal had been taken." We agree with the Service's position that the departure of an alien subject to deportation proceedings during the pendency of the Service's appeal does not constitute a constructive withdrawal of the Service's appeal.

The language of 8 C.F.R. § 3.4 makes no mention of appeals filed by the Service and, in our view, does not contemplate the conferment upon an alien of the power to effectuate the withdrawal of the Service's appeal by departing from the United States during the pendency of the appeal before this Board. As the Service notes in its appeal, the conferment of such an extraordinary power would have troubling implications, as it would allow an alien to avoid a potentially adverse ruling by this Board by defeating the Service's ability to prosecute an appeal. *See, e.g., Matter of Valles*, 21 I&N Dec. 769, at 773 (BIA 1997) (holding that an alien may not defeat a Service appeal by continually filing bond redetermination requests); *Matter of Brown,* 18 I&N Dec. 324, 325 (BIA 1982) (holding that an alien may not defeat a Service appeal and nullify deportation proceedings by effecting a departure from and subsequent reentry to the United States). We therefore hold that the respondent's departure from the United States did not serve as a constructive withdrawal of the Service's appeal.

## B. Respondent's Departure Does Not Render the Service's Appeal Moot

We also conclude that the respondent's departure did not render moot the Service's appeal from the Immigration Judge's November 25, 1996, order terminating deportation proceedings. The traditional "mootness doc-

trine" to which the Service refers in its brief applies to Article III courts only. The mootness doctrine, like those relating to standing, ripeness, and justiciability, is rooted in the constitutional requirement that federal courts may exercise judicial power only when presented with actual, live cases or controversies. *See* U.S. Const. art. III, § 2; *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990); *National Treasury Employees Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996); *Brooks v. Georgia State Bd. of Elections,* 59 F.3d 1114, 1118-19 (11th Cir. 1995). As an administrative tribunal, this Board is not subject to Article III's case-or-controversy requirement, and therefore our jurisdiction is not governed or restricted by constitutional "mootness doctrine" jurisprudence.[3]

At the same time, however, in exercising our regulation-defined "discretion and authority . . . as is appropriate and necessary for the disposition of [a] case," 8 C.F.R. § 3.1(d)(1) (1999), this Board has reserved the discretion to dismiss appeals and deny motions as moot as a matter of prudence. In certain circumstances, where a controversy has become so attenuated or where a change in the law or an action by one of the parties has deprived an appeal or motion of practical significance, considerations of prudence may warrant dismissal of an appeal or denial of a motion as moot. *See, e.g., Matter of Valles, supra* (alien's bond appeal mooted where Immigration Judge grants alien's bond redetermination request during pendency of appeal); *Matter of Okoh*, 20 I&N Dec. 864, 865-66 (BIA 1994) (alien's motion for reconsideration mooted when Board's final order was executed, and alien was excluded and deported); *Matter of Rosales*, 19 I&N Dec. 655, 657 (BIA 1988) (Service's appeal of Immigration Judge's grant of attorney's motion to withdraw as counsel mooted by Immigration Judge's grant of such motion and attorney's discontinuance of representation of alien); *Matter of Alphonse*, 18 I&N Dec. 178, 180 (BIA 1981) (alien's appeal from denial of motion for change of venue was moot where Immigration Judge did not have jurisdiction to rule on motion in first instance); *Matter of Wong*, 15 I&N Dec. 209, 210 (BIA 1975) (issue raised by Service in motion mooted by changes in law during pendency of motion); *Matter of Gilikevorkian*, 14 I&N Dec. 454 (BIA 1973) (Service's cross appeal challenging Immigration Judge's grant of voluntary departure mooted where Board sustained alien's appeal of Immigration Judge's denial of adjustment of status).

On the other hand, appeals that may ordinarily be considered moot

---

[3]We therefore need not address the Service's contention that this matter falls within the "capable of repetition, yet evading review" exception to the mootness doctrine. *See, e.g., Spencer v. Kemna*, 523 U.S. 1, 118 S. Ct. 978, 988 (1998) (discussing "capable of repetition" exception to mootness doctrine); *Brooks v. Georgia State Bd. of Elections, supra*, at 1120 (same).

"need not be so considered in each and every circumstance." *Matter of Morales*, 21 I&N Dec. 130, at 147 (BIA 1996). For example, in *Matter of Keyte, supra*, we declined, as a matter of prudence, to dismiss as moot the appeal of an alien in exclusion proceedings who had departed from the United States after taking an appeal to the Board where our "resolution of the appeal adverse to the [alien] would still have legal consequences." *Id.* at 159. In *Matter of Morales, supra*, we declined to dismiss as moot an interlocutory appeal filed by an alien who had been excluded and deported because the appeal "had merit, properly asserted rights under [the law], was at no time specifically withdrawn, and raised issues . . . of continuing importance [to] the administration of the immigration laws." *Id.* at 147. Moreover, we have held in cases arising in both exclusion and deportation proceedings that an alien's departure from the United States during the pendency of an appeal by the Service does not necessarily serve to defeat the Service's appeal. *Matter of Brown*, *supra* (deportation proceedings); *Matter of Mincheff,* 13 I&N Dec. 715, 721 n.1 (BIA 1970, 1971) (exclusion proceedings).

In view of the aforementioned prudential considerations, we find that the respondent's departure from the United States pursuant to the January 30, 1997, joint stipulation before the district court does not warrant dismissal of the Service's appeal as moot. Like the interlocutory appeal in *Morales*, the Service's appeal has merit, has not been specifically withdrawn, and raises important issues of immigration law, namely the proper interpretation of provisions of section 241(a)(4) of the Act pertaining to the national security of this country. As in *Keyte*, a resolution of the Service's appeal adverse to the respondent would have significant legal consequences if the respondent were to seek admission to the United States in the future.

Furthermore, the joint stipulation expressly embodies the agreement between the respondent and the Service that the respondent's departure would not affect the pendency and vitality of the Service's appeal. This agreement signifies the parties' acknowledgment that the controversy is a live one with material legal consequences for the parties. While the stipulation is not controlling and cannot confer jurisdiction on this Board, it nevertheless is a prominent factor in our exercise of discretion regarding the appeal's mootness. Inasmuch as we hold that the Service's appeal has not been mooted by the respondent's departure, we will proceed to an analysis of the substantive issues presented on appeal.

## IV. RESPONDENT'S DEPORTABILITY UNDER SECTION 241(a)(4)(A)(i) OF THE ACT

### A. Arguments on Appeal

In its appeal, the Service challenges the soundness of the Immigration Judge's determination that it had not met its burden of proving the respondent's deportability under section 241(a)(4)(A)(i) of the Act. The Service contends that section 241(a)(4)(A)(i) presents a broad basis of deportability for aliens who violate "any law relating to espionage." According to the Service, section 241(a)(4)(A)(i) requires neither a conviction nor a finding that actual acts of espionage were perpetrated. The Service argues that the phrase "violate any law relating to espionage" should encompass a broad range of statutes, including 50 U.S.C. § 851, which are foreign agent registration statutes.[4] The record, the Service maintains, shows that the respondent has engaged in activity as an agent of a foreign power, and that he was required to register under one of these provisions which, according to the Service, are laws "relating to espionage." The Service contends that because the respondent has failed to register, he is deportable as charged.

The respondent, on the other hand, contends that the focus of our inquiry should be the definition of the term "espionage." According to respondent, the legal definition of "espionage" requires the acquisition of information relating to the national defense of the United States and communication of the information to a foreign nation, knowing that it will be used to the advantage of such nation or to the injury of the United States. The respondent emphasizes that the record is void of any evidence indicating that his intelligence gathering targeted national defense secrets of this country. The respondent argues that his information gathering was similar to that which any person in the United States has the right to conduct under the First Amendment, i.e., investigate and acquire information about a particular group or person, and that this activity does not qualify as espionage. The respondent argues that because he did not engage in any activity which violated any law relating to espionage, he can not be found deportable as charged.

## B. Analysis

The respondent in this matter is a known agent of the CUIS who was observed by special agents of the FBI and the Service while engaged in a clandestine meeting with another CUIS agent and in possession of various items of "spy trade-craft." The essential query before us is whether the Service sustained its burden of demonstrating by clear, unequivocal, and convincing evidence that the respondent "has knowledge of, or has received

---

[4]In its brief on appeal the Service asserts that the respondent violated several foreign agent registration statutes, to wit, 50 U.S.C. § 851, 18 U.S.C. § 951 (1994), and 22 U.S.C. § 611 (1994 & Supp. II 1996). Given our disposition of this appeal, we need not address whether the respondent violated other registration statutes.

instruction or assignment in, the espionage, counter-espionage, or sabotage service or tactics" of the Cuban Government and therefore violated 50 U.S.C. § 851, a federal registration law relating to espionage. *See* section 241(a)(4)(A)(i) of the Act. Upon review, we find that the record bears sufficient proof to support a finding of deportability under section 241(a)(4)(A)(i) of the Act.

In his decision, the Immigration Judge correctly held that 50 U.S.C. § 851 is a law "relating to espionage," section 241(a)(4)(A)(i) of the Act, and that the respondent did not register with the Attorney General under 50 U.S.C. § 851 or any other foreign agent registration statute. The Immigration Judge ultimately concluded, however, that the Service failed to establish that the respondent had violated 50 U.S.C. § 851, which requires the registration with the Attorney General of any person "who has knowledge of, or has received instruction or assignment in, the espionage, counter-espionage, or sabotage service or tactics of a government of a foreign country." He found that the evidence of record does not clearly show that the respondent was engaged in activities designed to clandestinely procure sensitive defense-related or classified information from the United States Government, activities which the Immigration Judge ruled are essential to espionage.

In so holding, however, the Immigration Judge overlooked the considerable breadth of the language of 50 U.S.C. § 851. Because the statute, at its most expansive reaches, requires only that the respondent have "knowledge of . . . the espionage, counter-espionage, or sabotage service or tactics" of the Cuban Government, we find that the Immigration Judge erred in terminating deportation proceedings.

### 1. Conviction for Violation of 50 U.S.C. § 851 Is Not Required for Deportability Under Section 241(a)(4)(A)(i) of the Act

As an initial matter, the Immigration Judge erred in holding that the respondent must have been convicted of a violation of 50 U.S.C. § 851 to be deportable under section 241(a)(4)(A)(i) of the Act. *Compare* section 241(a)(4)(A)(i) of the Act ("Any alien *who has engaged, is engaged, or at any time after entry engages in . . . any activity to violate* any law of the United States relating to espionage or sabotage" is deportable) (emphasis added) *with* 50 U.S.C. § 855(b) (Supp. II 1996) ("Any alien *convicted of a violation* of this subchapter or any regulation thereunder is subject to deportation.") (emphasis added). Notwithstanding the language of 50 U.S.C. § 855(b), section 241(a)(4)(A)(i) of the Act, the controlling provision under which the respondent has been charged with deportability, does not require a conviction. *Cf.* section 241(a)(3)(B)(ii) of the Act (rendering deportable "[a]ny alien who at any time *has been convicted . . . of a violation of, or an* attempt or conspiracy to violate, any provision of the Foreign Agents

Registration Act of 1938 (22 U.S.C. 611 et. seq.)") (emphasis added). Rather, the clear language of the provision requires only engagement, past or present, in any activity in violation of a law relating to espionage.

### 2. Scope of 50 U.S.C. § 851 Registration Statute

The aim of the 50 U.S.C. § 851 registration statute at its inception was to cast a wide net to ensnare those who may not have yet engaged in espionage or counter-espionage, but who possess the requisite knowledge or have received instruction in that field. The statute is indiscriminate with respect to when, where, how, or why the person at issue obtained the knowledge of or training in the espionage or counter-espionage tactics of a foreign government. It does not prescribe the requisite extent of the person's knowledge or training. Further, the statute encompasses those with knowledge of the espionage or counter-espionage service or tactics of a foreign government who no longer act as foreign agents. *See generally* S. Rep. No. 84-2719 (1956), *reprinted in* 1956 U.S.C.C.A.N. 4056; S. Rep. No. 83-1819 (1954), *reprinted in* 1954 U.S.C.C.A.N. 3985. Congress modeled the provision precisely so that it could be used against persons or organizations "inimical to American interests," including the Cuban Government's intelligence service and its agents. *Attorney General v. The Irish People, Inc.,* 684 F.2d 928, 941 (D.C. Cir. 1982), *cert. denied sub nom. The Irish People, Inc. v. Smith,* 459 U.S. 1172 (1983).

The registration statute provides the Federal Government with both: (1) a means of keeping track of and monitoring foreign spies in the United States; and (2) a law enforcement tool for prosecuting or deporting foreign spies without necessarily having to undertake the extraordinarily difficult task of proving beyond a reasonable doubt that the person in question in fact engaged in espionage, counter-espionage, or sabotage in violation of federal law. A review of the case law concerning prosecutions under the traditional federal espionage statutes illuminates the exceptionally painstaking burden of surveilling and detecting such clandestine activities and then proving each of the complex elements of the specific crimes. *E.g., United States v. Truong Dinh Hung,* 629 F.2d 908, 920 (4th Cir. 1980), *cert. denied,* 454 U.S. 1144 (1982); *United States v. Heine*, 151 F.2d 813 (2d Cir. 1945), *cert. denied*, 328 U.S. 833 (1946); *United States v. Enger*, 472 F. Supp. 490 (D.N.J. 1978).

The respondent argues strenuously that absent a conclusive showing that he was engaged in activities aimed at procuring nonpublic national defense-related or classified information, he cannot be found to be in violation of 50 U.S.C. § 851. However, "espionage" may be construed as having a more general meaning such as "[t]he act or practice of spying or of using spies to obtain secret intelligence." *Webster's II New Riverside University Dictionary* 443 (1984); *see also United States v. Morison*, 604 F. Supp. 655,

659 (D. Md. 1985) (citing various definitions of "spy"), *aff'd*, 844 F.2d 1057 (4th Cir.), *cert. denied*, 488 U.S. 908 (1988). Similarly, one commentator explained that "espionage can be defined as the consciously deceitful collection of information, ordered by a government or organization hostile to or suspicious of those the information concerns, accomplished by humans unauthorized by the target to do the collecting." Lt. Col. Geoffrey B. Demarest, *Espionage in International Law*, 24 Denv. J. Int'l L. & Pol'y 321, 325-26 (1996) (also noting that "counter-espionage" is generally considered to be the practice of actively or passively preventing, confusing, or altering hostile espionage, *id.* at 327).

The registration statute, for instance, does not specifically exclude from its purview persons with knowledge of industrial and economic espionage service or tactics of a foreign government. *See generally* Economic Espionage Act of 1996, Pub. L. No. 104-292, tit. I, § 101(a), 110 Stat. 3488, 3488 (codified at 18 U.S.C. § 1831 (proscribing certain economic espionage offenses); 50 App. U.S.C.A. § 2170b (West Supp. 1996) (requiring the President to submit to Congress annual reports on foreign industrial espionage). In the post-Cold War era, industrial and economic espionage pose an increasingly potent threat to the national security of the United States. *See, e.g., Threats to U.S. National Security: Hearing Before the Senate Select Committee on Intelligence* (Jan. 28, 1998) (statement of Louis J. Freeh, Director, FBI), *available in* 1998 WL 42038; *Economic Espionage: Joint Intelligence-Judiciary Hearing on Economic Espionage Before the Senate Select Committee on Intelligence* (Feb. 28, 1996) (statement of Senator Herb Kohl), *available in* 1996 WL 90789.

Nor does the statute require engagement in or knowledge of espionage, counter-espionage, or sabotage "activities." It specifies only knowledge of a foreign country's espionage, counter-espionage, or sabotage "service or tactics" as triggering the registration requirement. The term "tactics" (as opposed to "activities," or even "strategies" or "schemes") is defined as "[t]he art or skill of employing available means to accomplish an end" or "a system or mode of procedure." *Merriam Webster's Collegiate Dictionary* 1200 (10th ed. 1997). Other references define "tactics" expansively as "[t]he technique or science of securing the objectives designated by strategy," *Webster's II New Riverside University Dictionary, supra*, at 1177, and "any system or method of procedure; esp. adroit devices or expedients for accomplishing an end," *Webster's New International Dictionary* (2d ed. 1961). The term "service" is equally broad. *See, e.g., Merriam Webster's Collegiate Dictionary, supra,* at 1070 (defining "service," inter alia, as "the occupation or function of serving" and "an administrative division (as of a government or business)").

### 3. Respondent's Knowledge and Activities

The voluminous record contains ample evidence of the respondent's knowledge of the espionage and counter-espionage "service or tactics" of the CUIS. The following is a summary of the key evidence of the respondent's knowledge:

(1) the respondent's initial admission against interest to FBI and Service special agents (joint counterintelligence task force) that he is a CUIS agent and an "agent handler";[5]

(2) the respondent's possession of various spy trade-craft items: (a) water soluble paper containing typewritten CUIS instructions for specific mission in Miami; (b) two tape recorders (one to provide background noise to frustrate possible secreted listening devices); (c) leather billfold with concealed compartment; (d) radio transmitter for receiving communications from Cuba; (e) $500 cash from CUIS to carry out specific mission in Miami;

(3) the respondent's conceded knowledge of executing intricate "dead drops" to receive and relay information to other CUIS agents and employing tactics for evading surveillance;

(4) FBI Special Agent Fernandez's expert opinion that the respondent received training from CUIS and that the respondent "had knowledge of the tactics of the [CUIS]"; and

(5) the respondent's clandestine meeting with another known CUIS agent in Miami on April 1, 1996.

In our view, this body of evidence is sufficient to support a finding that the respondent has knowledge of the espionage and/or counter-espionage service or tactics of the CUIS. While much of the evidence is circumstantial, reliance upon circumstantial evidence of the sort presented by the Service in this case is indispensable given the secretive nature of espionage and counter-espionage and the fact that the Service is endeavoring to prove the respondent's personal knowledge. Nonetheless, as the Supreme Court has observed, "[D]irect evidence of a fact is not required. Circumstantial

---

[5]During proceedings below, the respondent challenged the admissibility of admissions against interest elicited by the FBI and Service agents on the ground that they were not voluntarily furnished and, therefore, were obtained in violation of the respondent's Fifth Amendment due process rights. *See, e.g., Matter of Barcenas*, 19 I&N Dec. 609, 611 (BIA 1988); *Matter of Garcia*, 17 I&N Dec. 319 (BIA 1980). As the agents' in-court testimony clearly established, however, the record bears no evidence of official overreaching on the part of the agents. The respondent has not demonstrated, even through prima facie evidence, that the agents obtained his admissions by physical or psychological coercion, intimidation, duress, or improper inducement, such that the respondent's will was overborne. *See Colorado v. Connelly,* 479 U.S. 157, 163-67 (1986); *United States v. Rojas-Martinez,* 968 F.2d 415, 417-19 (5th Cir.), *cert. denied sub nom. Michel v. United States,* 506 U.S. 1039 (1992), and *Casas-Acevedo v. United States,* 506 U.S. 1059 (1993); *Navia-Duran v. INS,* 568 F.2d 803, 808-11 (1st Cir. 1977); *Matter of Garcia, supra.*

evidence is not only sufficient, but may also be more certain, satisfying, and persuasive than direct evidence." *Michalic v. Cleveland Tankers, Inc., 364* U.S. 325, 330 (1960). Here, a conclusive inference that the respondent possesses knowledge of the espionage or counter-espionage service or tactics of the CUIS can reasonably be drawn from this set of clear and narrowly established facts.

## V. CONCLUSION

The precise definitions of espionage or counter-espionage should not control the disposition of this matter. The record reflects that the respondent, as an active CUIS agent and "agent handler," possesses highly specialized knowledge of the tools, procedures, techniques, adroit devices, expedients, and methods employed by the CUIS to accomplish its espionage ends. In other words, the respondent's esoteric knowledge and skills are applicable to various intelligence gathering goals, regardless of the fruit of the particular spy assignment.

Thus, the respondent would employ this same tactical knowledge irrespective of whether the intelligence sought is national defense-related information from the United States Government; commercial trade secrets of a United States corporation; information on the espionage activities of the United States Government or an American organization; or secrets of anti-Castro paramilitary organizations in this country. The mere fact that perhaps in this instance, the respondent was not seeking to procure sensitive national defense-related information is of no moment. Indeed, the respondent may never have been or may never be assigned to such a mission.

The record clearly establishes, however, that the respondent is conversant with the "service or tactics" of the CUIS to accomplish its various espionage and counter-espionage ends. In view of the body of evidence set forth above and the considerable breadth of the language of 50 U.S.C. § 851, we hold that the record establishes the respondent's deportability under section 241(a)(4)(A)(i). Accordingly, the following orders will be entered.

**ORDER:** The appeal of the Immigration and Naturalization Service is sustained.

**FURTHER ORDER:** The Immigration Judge's order of November 25, 1996, is vacated, and the record is remanded to the Immigration Court for further proceedings consistent with the foregoing opinion.

Board Members Gustavo Villageliu, Lori Scialabba, and Anthony C. Moscato did not participate in the decision in this case.

*CONCURRING AND DISSENTING OPINION:* John W. Guendelsberger, Board Member, in which Paul W. Schmidt, Chairman, joined

I concur in the majority decision, for the reasons stated therein, that the instant appeal has not been rendered moot or effectively withdrawn by the respondent's departure from the United States to Cuba during the pendency of the appeal. I dissent, however, from the majority's determination that the respondent is deportable under the terms of section 241(a)(4)(A)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1254(a)(4)(A)(i) (1994). In regard to that issue, I agree entirely with and join the dissenting opinion of Board Member Fred W. Vacca, in which Board Member Lory D. Rosenberg joined.

*DISSENTING OPINION:* Fred W. Vacca, Board Member, in which Lory D. Rosenberg, Board Member, joined

In a decision dated November 25, 1996, an Immigration Judge terminated the deportation proceedings against the respondent, finding that the Immigration and Naturalization Service failed to meet its burden of proving the charges as set forth above. The Service timely appealed only the issue of whether they proved the charge of deportability under section 241(a)(4)(A)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(4)(A)(i) (1994). I disagree with the majority's decision to sustain the Service's appeal. Prior to discussing my reasons for disagreeing with the majority's substantive decision, however, I will also discuss my dissent from certain procedural conclusions it makes.

## I. PROCEDURAL ISSUES

Following receipt of both the Service's and the respondent's briefs on appeal, this Board issued a letter dated May 14, 1998, requesting that the parties advise us of the respondent's whereabouts. In the event the respondent's location was outside of the United States, we also asked that the parties address the issue of the effect of his departure on the proceedings currently pending before the Board.

Both parties have responded to our letter and have informed us that the respondent is no longer in this country.[1]  The respondent argues that the

---

[1]According to evidence submitted by the Service, the respondent, who had been held in detention despite an order from the Immigration Judge to release him, filed a Petition for Writ of Habeas Corpus relief with the United States District Court, Southern District of Florida, alleging that he was being wrongfully detained. The parties then entered into an agreement, enforced by the district court, which allowed the respondent to depart the United States and to remain in Cuba during the pendency of the Service's appeal before us.

effect of his departure is that the Service's appeal is now moot. In contrast, the Service asserts that the respondent's departure does not affect the Board's authority to rule on the issue of deportability raised by the Service on appeal. A majority of the Board Members agrees with the Service. I dissent for the following reasons.

## A. 8 C.F.R. § 3.4

First of all, unlike the majority, I find that this case is controlled by our regulations. Specifically, 8 C.F.R. § 3.4 states in pertinent part that

> [d]eparture from the United States of a person who is the subject of deportation or removal proceedings, except for arriving aliens as defined in § 1.1(q) of this chapter, subsequent to the taking of an appeal, but prior to a decision thereon, shall constitute a withdrawal of the appeal, and the initial decision in the case shall be final to the same extent as though no appeal had been taken.

8 C.F.R. § 3.4 (1999).

The Service argues that the plain meaning of this section of the regulations establishes that an alien's departure *only* constitutes a withdrawal of an appeal if the appeal was taken by the alien; it does not apply to cases such as this where the Service has lodged an appeal. To interpret the regulation otherwise, according to the Service, is to permit an alien to force dismissal of an appeal simply by choosing to depart the United States.

In support of its position, the Service cites to several cases, issued by both the Board and various circuit courts. *See Mejia-Ruiz v. INS*, 51 F.3d 358 (2d Cir. 1995); *United States v. Blaize*, 959 F.2d 850 (9th Cir.), *cert. denied,* 504 U.S. 978 (1992); *Aleman-Fiero v. INS*, 481 F.2d 601 (5th Cir. 1973); *Matter of Keyte*, 20 I&N Dec. 158 (BIA 1990); *Matter of Brown*, 18 I&N Dec. 324 (BIA 1982). Having reviewed all of those cases, I do not find them dispositive of the issue in this case.

First, with regard to the circuit court cases cited by the Service, all of the courts upheld the general rule as found in 8 C.F.R. § 3.4 that an appeal is considered withdrawn upon the departure of an alien from the United States. Admittedly, none of the cases involved an appeal by the Service. Conversely, however, I find no indication that the courts would have decided otherwise had the appeal been instigated by the Service.

Second, the cases adjudicated by this Board which find that a departure did not cause the appeal to be considered withdrawn are distinguishable from the case at hand. For instance, in *Matter of Keyte, supra*, the Board held that the departure from the United States by an applicant for admission in exclusion proceedings after the taking of an appeal from the Immigration Judge's order denying admission does not constitute withdrawal of the appeal. However, we specifically noted that 8 C.F.R. § 3.4 did not apply to the applicants precisely because they were in exclusion proceedings and not

deportation proceedings. We stated that the "departure pending [the] appeal of an alien who has been stopped at the border and ordered excluded is not necessarily incompatible with a design to prosecute the appeal to a conclusion." *Matter of Keyte, supra,* at 159. This was due to the fact that although the aliens had departed the United States following the filing of their appeal, they had also returned to this country, seeking admission a second time.

Such a situation is wholly different from this case where the respondent has essentially deported himself—here, the Service's request to continue to prosecute an alien in order to deport him when he has already left the country is incompatible with judicial economy and, unlike *Matter of Keyte, supra,* a resolution of the appeal adverse to the respondent would *not* have immediate legal consequences. Furthermore, in *Matter of Delagadillo*, 15 I&N Dec. 395 (BIA 1975), the Board alluded to the propriety of the result that I find appropriate here. In *Matter of Delagadillo, supra*, the Board referred to a prior hearing in which the Immigration Judge found that the respondent, who then was in deportation proceedings, was not deportable as charged, stating that, "[t]he Service appealed from the Immigration Judge's decision. However, *we never resolved that appeal because the appellant had departed the United States*, had attempted to be readmitted, and had been placed in exclusion proceedings while his case was on appeal. We accordingly returned the record to the Service." *Id.* at 395-96 (emphasis added).

A similar scenario arose in *Matter of Brown, supra*. In that case, an Immigration Judge had terminated proceedings against the respondent because he had departed during the pendency of the proceedings. Vacating the Immigration Judge's decision, we stated that "[d]eportation proceedings previously commenced against an alien are not nullified by his temporary absence from the United States." *Matter of Brown, supra*, at 325. Rather, "[a]s long as the allegations and charges stated in the Order to Show Cause continue to be applicable, the alien remains subject to deportation." *Id.* The alien "cannot compel the termination of deportation proceedings which have been commenced against him merely by effecting a departure and reentry." *Id.*

In the present case, however, neither has there been a reentry nor do the charges listed in the Order to Show Cause continue to be applicable in light of the respondent's departure to Cuba. Indeed, the entire deportation process, beginning with the issuance of the Order to Show Cause is designed to remove the respondent from the United States. As this "goal" has been achieved, I find it a waste of this Board's time, and a waste of the taxpayers' money, for the Service to have filed this appeal in the first place and, secondly, to continue to prosecute the appeal to this length.

Based on the foregoing, I disagree with the Service's argument that caselaw supports a finding that 8 C.F.R. § 3.4 applies only to appeals filed by aliens. Furthermore, I find that the plain language of that regulation

763

makes no distinction as to whether departure of an alien affects one party but not the other. Therefore, in contrast to the majority, I conclude that 8 C.F.R. § 3.4 applies equally whether an appeal is filed by an alien or the Service. In other words, I would hold that the departure of the respondent acts to withdraw the Service's appeal in this case as though no appeal had been taken and, therefore, the Immigration Judge's decision becomes final.

## B. Mootness

I also disagree with the majority's decision that the respondent's departure does not render this case moot. A moot issue is generally defined as one where the matter in dispute has been resolved and the issue is largely academic or dead. *Black's Law Dictionary* 522 (5th ed. 1983). There must be a live "case or controversy" such that we, as a quasi-judicial body, can act on it and issue a decision which actually affects the parties involved.[2] *Id.* at 112.

The majority concludes that there is such a live case at hand and relies heavily on the fact that the parties entered a stipulation agreement. Why this factor alters the outcome of the case is wholly unclear. Indeed, in my mind, the fact that the Service *agreed* to allow the respondent to depart and, in effect, self-deport, establishes that the Service should have been aware that the stipulation agreement would affect its case. By continuing forward with the case against the respondent, despite having already achieved the intended result of deportation, the Service essentially asks this Board to render an advisory opinion. Although we have stated in the past that we would not do so,[3] an unnecessary exegesis has been provided by the majority on why the respondent must be deported—despite the fact that he has in fact *already* been deported. In my opinion, the majority's decision sets forth a dangerous precedent, allowing advisory opinions to be issued in what may be an interesting or novel, but ultimately, moot case.

---

[2]I note the majority's statement that the "traditional 'mootness doctrine,'" which requires a case or controversy, is not binding on this Board; it is an Article III court requirement only. *Matter of Luis*, 22 I&N Dec. 3395, at 8 (BIA 1999). However, it clearly has been used as a guide on which to base our discretionary determinations as to whether a case has become moot. As stated by the majority, our particular brand of mootness involves a case "where a controversy has become so attenuated or where a change in the law or an action by one of the parties has deprived an appeal or motion of practical significance, considerations of prudence may warrant dismissal of an appeal or denial of a motion as moot." *Id.* How exactly this concepts differs from the traditional Article III concept of a case or controversy is not made clear by the majority. In my mind, the only difference is that the former (our articulation of the mootness doctrine) is the product of case law, whereas the latter is constitutionally mandated. In other words, our brand of mootness is easily altered, as seen in the majority's opinion.

[3]*See Matter of Leon-Orosco and Rodriguez-Colas,* 19 I&N Dec. 136 (BIA 1983; A.G. 1984).

In addition, the cases cited by the majority are, as shown above with regard to 8 C.F.R. § 3.4 of our regulations, easily distinguished from the case at hand. *Matter of Keyte, supra*, as already stated, was a case in exclusion proceedings; the respondent here is in deportation proceedings.

The two cases cited by the majority to establish that an alien's departure does not serve to defeat the Service's appeal dealt with *temporary* departures only. *See Matter of Brown*, 18 I&N Dec. 324 (BIA 1982); *Matter of Mincheff*, 13 I&N Dec. 715 (BIA 1970, 1971). It is easy to see how such cases remain "alive." In contrast, the respondent in this case has left the United States with no evident intention of returning. Were he to return and seek readmission, as the respondent in *Delagadillo* did, the proper course of action would be to address the issue concerning his admissibility in a removal proceeding at that time. *Matter of Delagadillo, supra*, at 396.

Finally, the majority relies on *Matter of Morales*, 21 I&N Dec. 130 (BIA 1996), to support its theory of mootness. The majority states that in *Morales* "we declined to dismiss as moot an interlocutory appeal filed by an alien who had been excluded and deported because the appeal 'had merit, properly asserted rights under [the law], was at no time specifically withdrawn, and raised issues . . . of continuing importance [to] the administration of the immigration laws.'" *Matter of Luis*, 22 I&N Dec. 3395, at 9 (BIA 1999) (quoting *Matter of Morales, supra*, at 147). The majority is simply wrong.

This Board does not avoid deciding interlocutory appeals because of mootness. Rather, we have long ago decided to forego deciding such appeals in order to avoid piecemeal review of the myriad questions which may arise in the course of immigration proceedings. *See Matter of Ruiz-Campuzano,* 17 I&N Dec. 108 (BIA 1979); *Matter of Ku*, 15 I&N Dec. 712 (BIA 1976). As the majority correctly points out, we have on occasion ruled on the merits of interlocutory appeals where we deemed it necessary to address important jurisdictional questions regarding the administration of the immigration laws, or to correct recurring problems in the handling of cases by immigration judges. *See, e.g., Matter of Guevara*, 20 I&N Dec. 238 (BIA 1990, 1991), and cases cited therein; *Matter of Dobere*, 20 I&N Dec. 188 (BIA 1990). However, the resolution of the issue in this case, namely, the effect of departure on *an appeal*, in no way stands to clarify jurisdictional questions for the Immigration Judges. The majority is simply using the logic applied to interlocutory appeals to try to fit the respondent's case within a new definition of mootness, one which stretches all our imaginations. I do not find this case interlocutory in nature and, furthermore, I do not find any live issues in need of adjudication. I dissent.

Even assuming the respondent's case were not dismissed on such procedural grounds as mootness or pursuant to regulation, I also disagree with the majority's decision to sustain the Service's appeal. As I find that the majority has adequately set forth the facts as well as the parties' respective

appellate positions, I decline to restate them here. However, as shown below, I disagree with regard to the conclusion that the evidence presented establishes that the respondent is deportable pursuant to section 241(a)(4)(A)(i) of the Act, as an alien who has engaged, is engaged, or any time after entry engaged in any activity to violate any law relating to espionage.

## II. SUBSTANTIVE ISSUES

### A. The Law

In order for the respondent to be found deportable, the Service has the burden of proving the truth of the facts alleged under each charge of deportability by clear, unequivocal, and convincing evidence. *Woodby v. INS,* 385 U.S. 276 (1966); 8 C.F.R. § 242.14(a) (1997). The respondent was charged with deportability under section 241(a)(4)(A)(i) of the Act.[4] The applicable statute under section 241(a)(4) reads:

SECURITY AND RELATED GROUNDS—

(A) IN GENERAL.—Any alien who has engaged, is engaged, or any time after entry engages in—

(i) any activity to violate any law of the United States relating to espionage or sabotage or to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information,

(ii) any other criminal activity which endangers public safety or national security, or

(iii) any activity a purpose of which is the opposition to, or the control or overthrow of, the Government of the United States by force, violence, or other unlawful means,

is deportable.

### B. Analysis

As pointed out by the parties, there is no clear legislative history or case precedent regarding the interpretation of section 241(a)(4)(A)(i) of the Act.

---

[4]Section 241(a)(4)(A)(i) of the Act was amended by section 308(f)(1)(N) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-621 ("IIRIRA"), and redesignated as section 237(a)(4)(A)(i) of the Act by section 305(a)(1) of the IIRIRA, 110 Stat. at 3009-598, applicable to cases initiated on or after April 1, 1997. Thus, the respondent is not subject to the amended ground of deportability.

Thus, our starting point in interpreting the statute must be the language employed by Congress. *See INS v. Elias-Zacarias*, 502 U.S. 478, 482 (1992); *Foy v. Schantz, Schatzman, & Aaronson, P.A.,* 108 F.3d 1347, 1348 (11th Cir. 1997). If the statutory language is clear, that is the end of the inquiry, as Immigration Judges and this Board, as well as the courts, "'must give effect to the unambiguously expressed intent of Congress.'" *Matter of W-F-,* 21 I&N Dec. 503, at 506 (BIA 1996) (quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843 (1984)); *see also Gonzalez v. McNary*, 980 F.2d 1418, 1420 (11th Cir. 1993). It is assumed that the legislative purpose is expressed by the ordinary or plain meaning of the words used. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987); *Matter of Fesale*, 21 I&N Dec. 114, at 117-18 (BIA 1995). A statute should be construed so that effect is given to all its provisions, so that no part of it will be inoperative or superfluous, void or insignificant. 2A Norman J. Singer, *Sutherland Statutory Construction* § 46.06, at 104 (4th ed. 1984). It is a court's duty "'to give effect, if possible, to every clause and word of a statute.'" *United States v. Menasche*, 348 U.S. 528, 538-39 (1955) (quoting *Inhabitants of Montclair Tp. v. Ramsdell*, 107 U.S. 147, 152 (1883)). There is "no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." *Perry v. Commerce Loan Co.,* 383 U.S. 392, 400 (1966).

## 1. Plain Meaning of Section 241(a)(4)(A)(i) of the Act

The plain language of section 241(a)(4)(A)(i) of the Act renders deportable any alien who after entry has engaged in "*any activity* to violate *any law* of the United States *relating to espionage*." (Emphasis added.) By its terms, the language of section 241(a)(4)(A)(i) does not require a conviction.[5] Indeed, there has been no showing that the respondent has ever been

---

[5]When Congress intends to legislate deportation consequences in connection with certain convictions, it knows how to do so. For example, section 241(a)(2) of the Act (which has been amended by section 305(a)(1) of the IIRIRA and redesignated as section 237(a)(2)) requires convictions to render an alien deportable for a variety of criminal offenses. For example, section 241(a)(2)(D) (redesignated as section 237(a)(2)(D) of the Act by the IIRIRA) requires a conviction to find deportable any alien who has been convicted of "any offense under chapter 37 (relating to espionage), chapter 105 (relating to sabotage), or chapter 115 (relating to treason and sedition) of title 18, United States Code." In addition, section 241(a)(3) of the Act (redesignated as section 237(a)(3) of the Act by the IIRIRA) renders deportable aliens who have been convicted of failure to register under the Alien Registration Act of 1940, or who have violated, or attempted or conspired to violate, the provisions of the Foreign Agents Registration Act of 1938, or the statutes relating to fraud and misuse of visas, permits, and other entry documents. In contrast, Congress specifically omitted the requirement of a conviction for deportability based on security-related grounds under section 241(a)(4) of the Act.

convicted of a criminal offense. The language of the statute dictates a five-part test in order to determine whether deportability has been established under section 241(a)(4)(A)(i). In order to establish deportability under section 241(a)(4)(A)(i), the Service has the burden of showing: (1) the type of activity engaged in by the alien; (2) when that activity occurred; (3) the law which the alien violated; (4) the law relates to espionage; and (5) the activities engaged in by the alien violated that particular law.

### a. "[H]as engaged, is engaged, or any time after entry engages in . . . *any* activity"

Under the first two prongs, the Service must show the type of activity engaged in by the alien and when it occurred. The type of activity is not specified and clearly encompasses a broad range of actions by use of the qualifier "any." The alien must have engaged in such activity in the past, be currently involved in such activity, or after entry have engaged in such activity.

I find that the Service demonstrated by clear, unequivocal, and convincing evidence that the respondent is an agent for the Cuban Intelligence Service. After his entry into the United States, the respondent engaged in clandestine information gathering upon direction from his handlers on the part of the Cuban Intelligence Service ("CUIS") and the Cuban Government. The Service stipulated that the target of the information gathering was a paramilitary Cuban exile group located in South Florida. The respondent possessed the instruments of spy trade craft, such as a billfold with a secret compartment, water soluble documents containing information to be gathered, and a micro cassette recorder and standard tape recorder. The water soluble documents specifically address the goals of the Cuban Government to protect its people against terrorists, and specifically list the names of persons about whom information was to be obtained. Thus, the respondent's activities, which commenced after his entry, were those of a spy or agent acting on behalf of a foreign government.

### b. "[T]o violate any law"

The third step is to determine which law or laws the alien allegedly violated. The plain language of section 241(a)(4)(A)(i) does not identify a specific law, such as the Espionage Act, 18 U.S.C. § 793, et seq., which must be violated. As the statute does not require the violation of a particular law, a broad interpretation of which laws relate to espionage is justified. *See Matter of Hernandez-Ponce,* 19 I&N Dec. 613, 616 (BIA 1988) (stating that the statutory reference to the "any law" uses words which "clearly contain no limitation").

### c. "[R]elating to"

In determining the fourth part, whether a particular statute relates to espionage, I find that the "relating to" language employed in section 241(a)(4)(A)(i) of the Act also appears in section 241(a)(2)(B)(i), which provides for the deportation of "[a]ny alien who at any time after entry has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country *relating to a controlled substance*." (Emphasis added.)[6] The "relating to" language used in section 241(a)(2)(B)(i) of the Act has been interpreted broadly by this Board and the courts. *See United States v. Salerno*, 66 F.3d 544, 550 (2d Cir. 1995), (holding that violation of Travel Act which outlaws other forms of criminal interstate travel is also, in appropriate cases, a law relating to controlled substances), *cert. denied sub nom. DiGirolano v. United States*, 516 U.S. 1063, (1996); *Matter of Del Risco*, 20 I&N Dec. 109, 110 (BIA 1989) (finding that a conviction for facilitation of the unlawful sale of cocaine is a violation of a law relating to a controlled substance); *Matter of Hernandez-Ponce, supra,* at 616 (finding that conviction for use and being under the influence of phencyclidine is a violation of a law relating to a controlled substance).

The Service argues that the "relating to" language of section 241(a)(4)(A)(i) of the Act, which is similar to the statute regarding controlled substances, renders it a statute of broad applicability. However, section 241(a)(2)(B)(i) is distinguishable in that in order to find an alien deportable for a violation of a law "relating to a controlled substance," a conviction is required and the term "controlled substances" is specifically defined within the Act. Our inquiry with respect to alleged controlled substance violators is to determine whether the offense of which they were convicted related to a "controlled substance" as defined by section 102 of the Controlled Substances Act, 21 U.S.C. § 802 (1994). *See Matter of Esqueda*, 20 I&N Dec. 850 (BIA 1994); *Matter of Del Risco, supra; Matter of Hernandez-Ponce, supra*. Although the words "relating to" may be read broadly, under section 241(a)(4)(A)(i) of the Act, the object of the law which the alien allegedly violated must be related to "espionage."

### d. "[E]spionage"

The term "espionage" is not defined within the Immigration and

---

[6]Section 241(a)(2)(B) of the Act has been amended and redesignated as section 237(a)(2)(B)(i) by section 305(a)(1) of the IIRIRA.

Nationality Act. In reviewing the legislative history, the Service contends that the origins of the phrase "relating to espionage" reflect that Congress intended the language to be applied broadly. The Internal Security Act of 1950, 64 Stat. 987, consisted of two titles: Title I which related to "Subversive Activities Control," and Title II which related to "Emergency Detention." Section 22 of Title I amended the exclusion and deportation provisions to provide for the exclusion of aliens when reason existed to believe that such aliens were likely to "engage in activities which would be prohibited by the laws of the United States relating to espionage," and for the deportation of those aliens who at the time of entering the United States or at any time thereafter were a member of one of the excludable classes of aliens, including the espionage-related exclusion ground. In contrast, section 115 of Title II regarding the emergency detention of persons, including United States citizens, upon a proclamation of a state of internal emergency, defined espionage as "any violation of sections 791 through 797 of title 18 of the United States Code, as amended." The Service argues that had Congress intended that the definition provided at section 115 apply to both titles, it could have easily implemented such intent. The fact that Congress did not provide a definition for "espionage" in Title I affecting aliens supports a conclusion that Congress intended for the term "espionage" to be interpreted more broadly than in Title II. The definition of espionage proposed by the Service is "[t]he act or practice of spying or of using spies to obtain secret intelligence." *See Webster's II New Riverside University Dictionary* 443 (1984).

On the other hand, the respondent claims that the definition of espionage was established at least as early as 1917 as part of the Espionage Act of 1917, 40 Stat. 217c. 30, which provides a two-prong test: (1) the information at issue related to national defense, and (2) that information was obtained with the intent or reason to believe the information would be used to the injury of the United States or to the advantage of a foreign government. *See also Black's Law Dictionary* 489 (5th ed. 1979) ("[e]spionage, or spying, has reference to the crime of 'gathering, transmitting or losing' information respecting the national defense with intent or reason to believe that the information is to be used to the injury of the United States, or to the advantage of any foreign nation").

I agree with the respondent's interpretation that Congress is presumed to be aware of both the language and judicial interpretation of pertinent, existing law when it passes legislation. *In Re Haas*, 48 F.3d 1153, 1157 (11th Cir. 1995). When Congress uses terms which have an accumulated and settled meaning, the court must infer, unless the statute dictates otherwise, that Congress means to incorporate the established meaning of the term. *N.L.R.B. v. Amax Coal Co.,* 453 U.S. 322, 329 (1981). I therefore feel constrained to incorporate the well-established legal definition in the absence of any statutory definition to the contrary.

### (1) "Espionage" Defined

Accordingly, I find that the ordinary meaning of the word "espionage," as employed within section 241(a)(4)(A)(i) of the Act, requires the gathering, transmitting, or losing of information respecting the national defense with intent or reason to believe that the information is to be used either to injure the United States or to advantage a foreign government. *See United States v. Robel*, 389 U.S. 258 (1967); *Gorin v. United States*, 312 U.S. 19 (1941); *see also, e.g.,* 18 U.S.C. §§ 793, 794, 798 (1994) (federal criminal statutes regarding espionage). "National defense" has been construed to include information regarding military and naval establishments and the related activities of national preparedness, including the National Guard. *Gorin v. United States, supra; see also United States v. Morison,* 844 F.2d 1057, 1071-72 (4th Cir.), *cert. denied*, 488 U.S. 908 (1988); *United States v. Truong Dinh Hung*, 629 F.2d 908, 918 (4th Cir. 1980), *cert. denied*, 454 U.S. 1144 (1982). Moreover, the connection with the national defense must be reasonably direct and natural, not strained and arbitrary, to make the obtaining and delivery thereof a criminal offense. *Gorin v. United States*, *supra*, at 31. Thus, although the document or information need not in fact be vitally important or actually injurious, it must be connected with or related to the national defense. *Gorin v. United States*, 111 F.2d 712, 717 (9th Cir. 1940) *aff'd*, 312 U.S. 19 (1944); *see also Ellsberg v. Mitchell*, 709 F.2d 51, 59 (D.C. Cir. 1983), *cert. denied sub nom. Russo v. Mitchell*, 465 U.S. 1038 (1984); *cf. United States v. Heine*, 151 F.2d 813 (2d Cir. 1945), *cert. denied,* 328 U.S. 833 (1946).

### (2) National Security Provision of Section 241(a)(4)(A)(ii) Distinguished

Furthermore, one must look to the rest of the Act so that effect is given to all of its provisions so that no part of it will be inoperative or superfluous, void or insignificant. *Gonzalez v. McNary, supra,* at 1420. Section 241(a)(4)(A)(ii) of the Act states that "any other criminal activity which endangers public safety or national security" renders an alien deportable. "'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *INS v. Cardoza-Fonseca, supra,* at 432 (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir. 1972))). Congress specifically included the word "espionage" in section 241(a)(4)(A)(i) in order to distinguish that provision from section 241(a)(4)(A)(ii), which addresses any other criminal activity which endangers public safety or national security. Thus, someone may be an agent of a foreign government and endanger the public safety or

national security but may not engage in acts of espionage. To otherwise read section 241(a)(4)(A)(i) of the Act to include acts of agents on behalf of foreign governments would render section 241(a)(4)(A)(ii) superfluous. "This construction, therefore, offends the well-settled rule of statutory construction that all parts of a statute, if at all possible, are to be given effect." *Weinberger v. Hynson, Westcott and Dunning, Inc.,* 412 U.S. 609, 633 (1973). Restricting section 241(a)(4)(A)(i) to its own terms avoids that result. Hence, these two provisions cover different scenarios in a complimentary, rather than a duplicative fashion. *See Allende v. Schultz*, 845 F.2d 1111, 1118 (1st Cir. 1988) (drawing a distinction between former sections 212(a)(27) and (29) of the Act, 8 U.S.C. §§ 1182(a)(27) and (29) (1994)).[7] Section 212(a)(27) rendered inadmissible any aliens who the consular officer or the Attorney General knew or had reason to believe sought to enter the United States, solely, principally, or incidently to engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States. The court found this to be a broader charge of inadmissibility than section 212(a)(29), which rendered inadmissible any alien who probably would, after entry, engage in activities which would be prohibited by the laws of the United States relating to espionage, sabotage, public order, or in other activity subversive to the national security.

### (3)  Respondent's Activities Did Not Violate Any Law Relating to Espionage

### a. Respondent Did Not Violate 50 U.S.C. § 851

In this case, the Service asserts, and the majority agrees, that the respondent violated 50 U.S.C. § 851 (1994), an alien registration statute.[8] Section 851 states:

Except as provided in section 852 of this title, every person who has knowledge of, or

---

[7]Sections 212(a)(27) and (29) of the Act were amended and reorganized by section 601 of the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978, 5067, 5069-70, and were redesignated as sections 212(a)(3)(C)(i) and 212(a)(3)(A), respectively.

[8]In its brief on appeal the Service asserts that the respondent violated foreign agent registration statutes, to wit, 50 U.S.C. § 851, 18 U.S.C. § 951, and 22 U.S.C. § 611. Before the Immigration Judge, the Service also claimed that the respondent had violated 18 U.S.C. § 794 (gathering, transmitting, or losing national defense information for the purpose of injuring the United States or to benefit a foreign nation); 18 U.S.C. § 957 (possession of property in aid of foreign government for purpose of violating any penal statute or violating the rights or obligations of the United States under any treaty or the law of nations); 18 U.S.C. § 371 (conspiracy to commit an offense); and 18 U.S.C. § 2 (making one who commits an offense against the United States punishable as a principal).

has received instruction or assignment in, the espionage, counter-espionage, or sabotage service or tactics of a government of a foreign country or of a foreign political party, shall register with the Attorney General by filing with the Attorney General a registration statement in duplicate, under oath, prepared and filed in such manner and form, and containing such statements, information, or documents pertinent to the purposes and objectives of this subchapter as the Attorney General, having due regard for the national security and the public interest, by regulations prescribes.

I find that by its plain language, 50 U.S.C. § 851 is a statute which "relates to espionage." It clearly requires the registration of an individual in the United States who has "knowledge of, or has received instruction or assignment in, the espionage, counter-espionage, or sabotage service or tactics" of a foreign government. The statute does not require that a person actually engage in the act of espionage, and I agree with the majority that it does not require a conviction. Rather, 50 U.S.C. § 851 makes it a criminal offense to be in the United States as a person with knowledge, assignment, or training in the espionage activities of a foreign government without registering with the Attorney General. There is no dispute that the respondent has not registered under this statute. However, the fifth prong of our inquiry is whether the activities of the respondent actually violated a particular law, in this case, whether he has demonstrated "knowledge of, or has received instruction or assignment in, the espionage, counter-espionage or sabotage service or tactics" of a foreign government in violation of 50 U.S.C. § 851. *See Allende v. Schultz, supra* (examination of activities to be engaged in by applicant to determine inadmissibility under former section 212(a)(27) of the Act.

In order to find that respondent violated 50 U.S.C. § 851, it must be determined whether he has "knowledge of, or has received instruction or assignment in . . . espionage." At no time has the Service asserted that the activities or information gathering engaged in by the respondent involved the national defense of the United States. In fact, the Service stipulated that the target of the respondent's information gathering may have been an anti-Cuban paramilitary organization, and there has been no evidence presented to link this organization with the national defense of this country. Indeed, the FBI witnesses who testified on behalf of the Service claimed an executive privilege with respect to the subject of the respondent's information gathering. However, without such information, I find that the Service has not demonstrated that the respondent was involved in the gathering of national defense secrets which would be injurious to the United States or

---

[9]I am not suggesting that the witnesses should have testified. However, if their testimony involved classified information, it could have been reviewed in an in camera hearing before the Immigration Judge. *See* section 242(b) of the Act, 8 U.S.C. § 1252(b) (1994); 8 C.F.R. § 242.15 (1997) (providing that the hearing shall be recorded verbatim except for statements made off the record with the permission of the Immigration Judge); 8 C.F.R. §

advantageous to the Cuban Government.[9]  In other words, the Service has not shown, and in its brief on appeal as much as conceded, that the respondent was not involved in acquiring information regarding the national defense of the United States.[10]

Moreover, there is no evidence that the respondent ever had knowledge of espionage activities on behalf of the Cuban Government, or that he received instruction or assignment in  espionage. The testimony of the FBI agents and the transcript of their interview with the respondent in New York failed to reveal that the respondent engaged in or had knowledge of activities dealing with the national defense of the United States. Although the agents believed the respondent was evasive in declining to discuss his training by CUIS, there is no showing that he ever received instruction or assignment in the espionage services of CUIS or other subversive tactics by the Cuban Government.

Further, the evidence of record reveals the respondent's target of his information gathering in this case involved PUND, a paramilitary organization operating in South Florida, not an American military or naval base or institution. Testimony presented by a journalist, who covered Cuba for several years, demonstrated that information regarding these paramilitary organizations is accessible in the public domain. *See United States v. Heine, supra,* at 815 (aviation industry information which was forwarded to an automobile corporation in Nazi Germany was "lawfully accessible to anyone who was willing to take the pains to find, sift, and collate it"). Such information, therefore, which may relate to the national defense, but is available to the public, cannot be deemed injurious to the United States, or to the advantage of a foreign nation within the espionage statutes. *Id.* at 816. In sum, I do not agree with the majority that the "circumstantial evidence" pointed to supports a finding that the respondent violated 50 U.S.C. § 851. Indeed, I do not find that the evidence supports a finding that the respondent violated any "espionage law."

---

242.16(c) (1997) (providing that the Immigration Judge shall receive evidence as to any unresolved issues). *See generally Kerr v. United States District Court*, 426 U.S. 394 (1976) (in camera proceedings are an appropriate means to resolve disputed issues of privilege); *United States v. Baptista-Rodriguez,* 17 F.3d 1354, 1362-63 (11th Cir. 1994) (regarding the Classified Information Procedures Act, 18 U.S.C.A. app. 3, §§ 1-16 (West Supp. 1988)); *United States v. Diaz-Munoz,* 632 F.2d 1330 (5th Cir. 1980) (requiring district court to review CIA materials in camera in order to determine if materials were exculpatory); *United States ex rel. Barbour v. District Director, INS*, 491 F.2d 573 (5th Cir.) (classified national security information reviewed by Board and in camera by district court in decision to deny bond), *cert. denied,* 419 U.S. 873 (1974).

[10]Within the context of the Espionage Act, only activities which threaten national defense are punishable.

### b. 18 U.S.C. § 951 and 22 U.S.C. § 611, Et Seq., Are Not Laws Relating to Espionage

For example, the Service also argues that 18 U.S.C. § 951 and 22 U.S.C. § 611, et seq., are laws "relating to espionage" which the respondent has violated. These two sections create criminal liability for any person, other than specifically exempted persons such as a diplomatic or consular officer or attache, who acts in the United States as an agent of a foreign government without prior notification to the Attorney General.[11]  In neither of these two statutes is the term "espionage" or language regarding the national defense of the United States present. Although I acknowledge that the lack of these terms within the statute does not necessarily preclude a finding that the statute relates to espionage (*cf., e.g., Coronado-Durazo v. INS, supra*), I do not find, and the Service has not shown, how these statutes relate to anything more than the failure to register. They have not shown that the term "agent of foreign government" is elsewhere defined as a person who is trained or engages in espionage. I recognize that these provisions clearly involve the national security of the United States and reflect Congress' concerns that persons acting on behalf of foreign governments make their presence known. However, I disagree with the Service's argument that someone who fails to register as an agent of a foreign government, ipso facto, is a person engaging in espionage.

I point out that 18 U.S.C. § 951(e)(2)(A) (1994) disqualifies as an exempted person an individual who is engaged in a legal commercial transaction if he or she operates subject to the direction or control of a foreign government or official and such person is an "agent of Cuba or any other country that the President determines (and so reports to the Congress) poses a threat to the national security interest of the United States for purposes of this section."  Although it is implicit that a person who serves as an agent on behalf of the Cuban Government is considered a threat to the national security interests of this country under 18 U.S.C. § 951, the plain language of section 241(a)(4)(A)(i) of the Act, which is the only security-related provision under which the respondent has been charged, does not render deportable an alien who is considered a threat to the national security interests of the United States. *Cf.* section 241(a)(4)(A)(ii) of the Act (an alien who has engaged in any other criminal activity which endangers public safety or national security is deemed deportable). I therefore do not find these provisions to "relate to espionage."

---

[11]I observe that section 241(a)(3)(B)(ii) of the Act renders an alien deportable if he has been convicted of a violation of, or an attempt or a conspiracy to violate, any provision of the Foreign Agents Registration Act of 1938, 22 U.S.C. § 611, et seq. (1994).

### C. Conclusion

This is a case where the Government has not met its burden of proof. Section 241(a)(4)(A)(i) of the Act does not require either a criminal conviction or evidence that the alien actually committed espionage in order to find deportability. However, the plain language of the statute dictates that the alien engage in activity which violates "any law relating to espionage." I define the term espionage as spying, which requires the gathering, transmitting, or losing of information respecting the national defense with intent or reason to believe that the information is to be used either to injure the United States or to advantage a foreign power. I conclude that the respondent is a spy of the Cuban Government who received assignment and instruction from a foreign power to conduct covert information gathering. However, I do not find that the Service proved by clear, unequivocal, and convincing evidence that respondent violated 50 U.S.C. § 851, or any other federal law, because there is no showing that he has knowledge of, or has received instruction or assignment in the espionage tactics or service of the Cuban Government, which would require knowledge, instruction, or assignment in activities that involve the national defense of the United States.

Moreover, although the majority does not address the issue, I would not find that the foreign agent registration statutes, 18 U.S.C. § 951 or 22 U.S.C. § 611, are laws relating to espionage. In my mind, the Board has no jurisdiction to judge whether the respondent is criminally liable under any of these statutes or those not under consideration here, or whether he would be deportable under any other provision of the Act. Based on the facts and the charges presented before me, I would find that the Service has not met its burden of proving deportability under section 241(a)(4)(A)(i) of the Act and would dismiss the appeal. For all of the foregoing reasons, I dissent.